Sidney Squibb, J.
In this claim for $1,696,692.61, the claimant has moved for .summary judgment in its favor, and the defendant has cross-moved for a dismissal of the case.
By these motions the litigants have agreed that the affidavits, exhibits and memoranda of law submitted are sufficient (without a trial) for the legal decision of the pervasive question of liability. Further, they are in accord that if it be declared that the claimant is entitled to judgment herein, then there would be a direction for an assessment of damages (to determine the exact amount of the judgment to be entered).
The claim (claimant’s pleading verified on March 7, 1967 and filed herein on March 9, 1967) alleges in part that
11 third : This claim arises out of various condemnation proceedings undertaken by claimant to acquire interests in real property in the City of New York in connection with Federally-aided interstate highway projects pursuant to 'Section 340-b of the Highway Law, as set forth in the Schedule a copy of which is annexed hereto as Exhibit ‘ A ’.
“ fourth: Pursuant to Subdivision 5 of Section 340-b of the Highway Law, claimant is entitled to reimbursement in full for the costs and expenses of such acquisitions, in the manner as provided in Section 349-c of the Highway Law.”
Said Exhibit “A” is a schedule containing minimal details of 86 decrees (final, partial and/or supplements thereto) and other particulars ostensibly composing the demanded $1,696,-692.61. The schedule lists specific dates of requests (for payments) made from August 30, 1960 through April 22, 1966.
It is undisputed that the State had reimbursed the city for each principal amount decreed plus one year’s interest thereon. But the State refused to repay the city for interest items which the city had paid beyond any one-year period. Accordingly, each of the items delineated in the schedule denominated “ Exhibit ‘A’” allegedly represented the numerous amounts of interest paid by the city to property owners in specified condemnation proceedings beyond the respective cut-off periods of one year’s interest.
It was and is the State’s legal position that interest reimbursement was constricted to one year from each title vesting date. Opposed to that, is the city’s posture that no such confinement of interest was applicable. To resolve such conflict of legal opinions, this litigation was instituted.
*519 In addition to said basic question, the State also maintains that claimant should have instituted an article 78 proceeding instead of suing in this court, and, in any event, that the ease was not timely instituted. Therefore, reasons the defendant, judgment cannot be recovered against it herein.
In more simple terms, on these two motions the parties herein request determinations of the following dispositive issues of law:
1. Is interest reimbursable beyond one year from each title vesting date?
2. Is this court the proper forum or should this litigation be in the Supreme Court of our State?
3. Was this claim timely filed?
I.
As alleged in the quoted paragraph third of the pleading, the basic statute to be construed at bar is the pertinent provision of section 340-b of the Highway Law of our State, headed “ Construction, improvement and maintenance of state interstate highways ”, of which subdivision 5 begins as follows: “ 5. Any property in the city of New York which is deemed by the superintendent of public works and the city of New York to be necessary for the construction, reconstruction and maintenance of interstate highways shall be acquired by the city of New York in the same manner as provided in section three hundred forty-nine-c of this chapter relating to the acquisition of property for the state arterial system in the city of New York, except that the city shall be reimbursed in full for the costs and expenses incurred by such acquisitions for interstate highways subsequent to the enactment of the federal aid highway act of nineteen hundred fifty-six, in the manner as provided in section three hundred forty-nine-c of this chapter relating to reimbursement of costs and expenses of acquisitions for the state arterial highways.”
The litigants emphasize that the critical portion of that sentence is at the end thereof reading 1 ‘ in the manner as provided in section three hundred forty-nine-c of this chapter ”. Indeed, the phrase ‘1 in the manner ’ ’ appears to be the pivot of this controversy; the axis on which this litigation revolves. The city avows that “ in the manner ” means the method (the procedure or the mechanics) recited in the reference subdivision 3.3 of section 349-c. The State opines that everything in said subdivision 3.3 of section 349-c applies, especially the restriction of interest to one year.
*520 Said section 349-c headed ‘ ‘ Design, construction, and payment of costs ” is part of article XII-B of the Highway Law, relating to “ State Arterial Highways Passing Through Cities ’ The material portions of said section 349-c appear in subdivision 3.3 thereof, more particularly:
“ 3. With relation to the city of New York: * * * 3.3. Amy property which is deemed by the superintendent of public works and the city of New York to be necessary to carry out the provisions of this article .shall be acquired by the city of New York by condemnation, purchase, or otherwise, pursuant to the city charter and administrative code, provided, however, that where property is acquired by purchase the superintendent of public works shall first file with the. board of estimate of the city of New York an estimate of the costs and expenses of such acquisition of property and any liability incurred by reason thereof, or by reason of the adverse effect of construction on adjacent property values, and upon approval of such estimate by such board of estimate of the city of New York, the liability of the state for such costs and expenses shall be expressly limited to the amount of such estimate. Where the property is acquired by condemnation, the approval of the superintendent of public works shall first be required, and the liability of the state shall thereafter be determined by the amount of damages awarded by the court for the property acquired, with interest on such award from the date of vesting of title to the date of final confirmation of the award by the court (provided that such interest period shall in no event exceed one year in duration from the date of vesting of title), together with costs, charges and expenses taxed by the court. The costs and expenses of such acquisition of property and any liability incurred by reason thereof, including legal damages caused by such acquisition, shall be paid by the city of New York in the first instance and shall be borne as follows: fifty per centum by the state and fifty per centum by the city. Whenever the city shall furnish to the Superintendent of public works a certification by the corporation counsel of the city of New York of the right, title or interest vested in the city of New York in and to property acquired for the purposes of this article for which reimbursement is to be made by the state of New York to the city of New York and a certificate stating the amount due such city, including the amount determined by a partial or final decree of the court having jurisdiction of any .such condemnation proceedings, for the said ácquisition of the property and any other costs and expenses thereof as herein authorized, the amounts' so fixed shall be paid out of *521 the state treasury to the city comptroller, after audit by the state comptroller, from monies that are now or that shall hereafter be made available to pay such costs and expenses, but not until there shall have been filed with thq state comptroller a certificate of the attorney general showing his approval of the certification of the corporation counsel as herein provided.”
The foregoing parenthetical matter: “ (provided that such interest period shall in no event exceed one year in duration from the date of vesting of title) ” is the- basic defense of the State herein. It insists that this restrictive language must be read into section 340-b. On such construction, the State resists reimbursement of interest beyond any first-year period.
Opposed to this reasoning is the city’s argument that interest is a matter of substance, not a “manner”. Resort to recognized law dictionaries and unabridged dictionaries demonstrates that manner means “ method ”, “a way of acting ”, “a way of doing ”, “ a mode of action ”, “a mode of procedure ” and that the prime synonyms of “manner” are “method” and “way ”.
Thus, “ in the manner ” referred only to the procedural conditions such as each of the essential certifications recited in said subdivision 3.3 of section 349-c. In practical terms, the procedure recited in the fourth sentence of said subdivision required:
1. “ a certification ” by the city’s corporation counsel as to title,
2. “ a certificate (apparently from the city comptroller) stating the amount due such city ’ ’,
3. “ a certificate of the ('State’s) attorney general showing his approval of the certification of the corporation counsel ’ ’ and
4. an “ audit by the state comptroller ”.
Says the city, it was this procedural machinery which the Legislature intended by “ in the manner ”. This, in effect, was another utilization of the time-honored principle of ‘1 checks and balances ” enunciated by the founding fathers of our Nation and repeated subsequently on all levels of government. The salutary purpose of the procedure (“the manner ”) was to cause the city’s corporation counsel and its comptroller to issue their separate official certifications upon which the State’s attorney general and its comptroller would severally perform their official duties.
In my opinion, the Legislature did not intend that the restriction of one year’s interest recited in subdivision 3.3 of section 349-c (part of “ Article XII-B.— State Arterial Highways Pass *522 ihg Through Cities ”) be engrafted upon subdivision 5 of section 340-b (part of “Article XII — State Routes ”). It would have been simple for our lawmaking body to state such restriction unequivocally. Indeed, a review of the statutory history compels the legal conclusion of no such limitation of interest repayment.
The legislative and executive branches of our State government always have been keenly aware of the substantial requirements of the inhabitants of the Empire State, their economy and well-being. In the years of World War II the essential needs for the conflicts raging in many portions of the globe, obscured and prevented attention to local matters at home. There resulted a reduction in the construction and maintenance of our highways. The war effort was predominant. Nonessential highway travel was frowned upon. The sale of gasoline for motor vehicles was rationed. Eventually, as our country was. emerging victorious in continent after continent, those in charge of the destinies of our State (in concert with our national officials) began to plan for postwar needs and economy.
Among the significant results emerging from the planning of the Dewey administration was the enactment of chapter 543 of the Laws of 1944, denominated ‘ ‘ an act to amend the highway law, in relation to the preparation of designs, plans, specifications and estimates of a state arterial system in cities ”. This created a new article, article XII-B, as an amendment to chapter 25 of the Consolidated Laws (our Highway Law). The legislative attention to the tremendous details thereof are readily apparent from a reading of pages 1083 through 1107 in the official publication of the Laws of New York for said year. The Arterial Highway Program was legislated into said Highway Law as sections 349-b through 349-f.
Instead of paraphrasing or summarizing the purposes declared and potentials envisioned by such enactment, it is better to quote the precise language of the initiating portion thereof:
“ § 349-b. Declaration of policy. The modernization and the construction of arterial highways which are to pass through cities, will contribute greatly to post-war reemployment and to the stimulation of industrial recovery. The resources and the technical skills that are available to the state for these purposes, should be used for the benefit of the cities upon the principle that the construction of such arterial highways is a matter of state concern. However, it is the manifest intention of the state to recognize and to preserve the powers or rights *523 heretofore conferred upon or delegated to any city to regulate the property, affairs or government thereof, in the modernization and the construction of such arterial highways. The integration of such arterial highways in the system of state highways throughout the state contemplates an expenditure of public funds to pay the costs that are attendant upon the fulfilment of a program of the work of modernization and construction as herein mentioned, as well as of the maintenance of such public ways. It is hereby declared to be the purpose of this act to initiate the procedure that is prerequisite to any project of the magnitude herein provided, to the end that orderly progress and equitable distribution of effort and moneys may be observed in the administration of this article, and, from time to time, when expressly authorized by the legislature, any section of such arterial highways may be constituted, constructed, reconstructed, improved and maintained as a part of the state highway system.”
Upon continued study of the program, one year later, chapter 619 of the Laws of 1945 was enacted on April 9, 1945. Section 349-c was amended in many particulars as well as its heading which became ‘ ‘ Design, construction, and payment of costs ”. In the first sentence of subdivision 1 thereof, there was a specific differentiation between “ (1) * * * any extension or continuation of any highway or route * * * upon any public street or streets in any city outside of the City of New York * # * and (2) of any existing or proposed main routes or thoroughfares in the city of New York; all of which are designated in this article.”
¡Such division had been warranted in the memorandum dated March 26,1945 (Appendix A, State’s Answering Memorandum) from the defendant’s Department of Public Works to Honorable Charles D. Breitel, then Counsel to Governor Dewey. On page 2 thereof, subdivision f, it declared that ‘ ‘ it has been necessary to divide the bill substantially in two parts, one of which is applicable to New York City only.” There followed this emphatic sentence: “ There is no basic difference in benefits as between New York City and other cities, the difference in the law being merely in methods of procedure. ’ ’
Subdivision 3.3 of said section 349-c was first enacted as part of said chapter. The first paragraph of said subdivision 3.3 initially provided: '' 3.3. Any property which is deemed by the superintendent of public works and the city of New York to be necessary to carry out the provisions of this article shall be acquired by the city of New York by condemnation, purchase, or otherwise, pursuant to the city charter and administrative *524 code, provided, however, that the superintendent of public works shall first file with the board of .estimate of the city of New York an estimate of the costs and expenses of such acquisition of property and any liability incurred by reason thereof, or by reason of the adverse effect of construction on adjacent property values, and upon approval of such estimate by such board of estimate of the city of New York, the liability of the state for .such costs and expenses shall be expressly limited to the amount of such estimate. The costs and expenses of such acquisition of property and any liability incurred by reason thereof, including legal damages caused by such acquisition, shall be paid by the city of New York in the first instance and shall be borne as follows: fifty per centum by the state and fifty per centum by the city. Whenever the city shall furnish to the superintendent of public works the written evidence and muniments of title to said property together with a certificate stating the amount due such city, including the amount determined by a partial or final decree of the court having jurisdiction of any such condemnation proceedings, for the said acquisition of the property and any other costs and expenses thereof as herein authorized, the amounts so fixed shall be paid out of the state treasury to the city comptroller, after audit by the state comptroller, from monies that are now or that shall hereafter be made available to pay such costs and expenses, but not until there shall have been filed with the state comptroller a certificate of the attorney general showing his approval of such written evidence and muniments of title whereby the property shall have been duly acquired by the city as herein provided. ’ ’
'Section 349-d (“Application of law, rules, conditions and regulations ”) and section 349-e (“ Cities named; streets designated ”) were not amended. Said section 349-e carefully specified the many public streets in 58 cities outside of the City of New York (recited seriatim alphabetically). More particularly, said cities were: Albany, Amsterdam, Auburn, Batavia, Beacon, Binghamton, Buffalo, Canandaigua, Cohoes, Corning, Cortland, Dunkirk, Elmira, Fulton, Geneva, Glens Falls, Gloversville, Hornell, Hudson, Ithaca, Jamestown, Johnstown, Kingston, Lackawanna, Little Falls, Lockport, Mechanicville, Middletown, Mt. Vernon, Newburgh, New Rochelle, Niagara Falls, North Tonawanda, Norwich, Ogdensburg, Olean, Oneida, Oneonta, Oswego, Peekskill, Plattsburgh, Port Jervis, Poughkeepsie, Rensselaer, Rochester, Rome, Rye, Salamanca, Saratoga Springs, Schenectady, Syracuse, Tonawanda, Troy, Utica, Watertown, Watervliet, White Plains and Yonkers. In sec *525 tion 349-f headed “ New York city routes ”, there were some amendments of designated ‘ ‘ existing or proposed main routes or thoroughfares ”.
Upon a closer reading and study of said subdivision 3.3., greater clarity evolves. The city’s procedure “pursuant to the said (New York City) charter and administrative code” were to be utilized (instead of, for example, the State’s procedure in its Court of Claims). It was expressly prescribed that “ the liability of the state for such costs and expenses shall be expressly limited to the amount of such estimate ’ ’ of its Public Works Superintendent (as distinguished from any decree of the Supreme Court or judgment of any other court).
Subdivision 3.3 further provided: “ The costs and expenses of such acquisition of property ’ ’ were to be “ paid by the city of New York in the first instance ” and were to “be borne as follows: fifty per centum by the state and fifty per centum by the city.”
As this enfolds, it is of interest to remember such initial 50-50 participation. To those of us specializing in the law of appropriation, this recital of history is a demonstrative interplay. The State was repaying the city only 50% of the State Superintendent’s estimate. The base was such estimate whether an owner’s case was (a) settled (“ by purchase ”) out of court or (b) tried and decided with an award made in a judicial decree or judgment. The city was not reimbursed 50% of what it was paying owners according to judicial decrees. The State was repaying only 50% of the estimate, not 50% of the adjudicated sum in numerous cases.
It took nine years for the financial imbalance to be assuaged. Chapter 701 of the Laws of 1954 (eff. April 14, 1954) amended subdivision 3.3 to take cognizance of the distinction between a settlement (purchase) and a trial court award. One of the changes provided that such estimates were to be applicable only ‘ ‘ where property is acquired by purchase ’ ’, more particularly: “ 3.3. Any property which is deemed by the superintendent of public works and the city of New York to be necessary to carry out the provisions of this article shall be acquired by the city of New York by condemnation, purchase, or otherwise, pursuant to the city charter and administrative code, provided, however, that where property is acquired toy purchase the superintendent of public works shall first file with the board of estimate of the city of New York an estimate of the costs and expenses of such acquisition of property and any liability incurred by reason thereof, or by reason of the adverse effect of construction on adjacent property values, and upon approval *526 of isuch estimate by such board of estimate of the city of New York, the liability of the state for such costs and expenses shall be expressly limited to the amount of such estimate. (New matter italicized.)
A new second sentence became law, expressly for the many other instances (previously unprovided for) where there were “damages awarded by the court for the property acquired” in a condemnation case or proceeding. Such new sentence prescribed that: ‘‘ Where the property is acquired by condemnation, the approval of the superintendent of public works shall first be required, and the liability of the state shall thereafter be determined by the amount of damages awarded by the court for the property acquired, with interest on such award from the date of vesting of title to the date of final confirmation of the award by the court (provided that such interest period shall in no event exceed one year in duration from the date of vesting of title), together with costs, charges and expenses taxed by the court.”
The restriction of reimbursement of interest to one year (enacted within the quoted parentheses) emerged here for the first time. As for principal amounts, the 5CM50 arrangement between the city and the State continued.
This appeared to be the status of the applicable State statutes, when, in 1956, the Federal-Aid Highway Act (70 U. S. Stat. 374) made dramatic changes in the scope and financing of our country’s highways and branches thereof. To underscore its importance, the program was newly designated as the “ National System of Interstate and Defense Highways ”. It was designed to link the principal metropolitan areas and industrial centers. It would serve the national defense and at suitable border points would be joined with Canadian and Mexican routes of continental importance.
For decades, there had been intensive preliminary legislative study on the national level .resulting in numerous official reports. Of enlightenment is the following portion from Senate Report No. 1093 dated March 25, 1954: “ There are actually only two physically separate Federal-aid highway systems, the primary and the secondary. The other two categories, to which the urban and interstate funds are allocated, are component parts of the primary system. The main through roads and interstate roads constitute the primary system. The secondary system consists of farm-to-market, county, and local roads which feed the local traffic into the primary roads. The urban category is simply those portions of roads on the primary system which are located in urban areas. The interstate.category *527 is a select network of primary roads chosen so as to connect the principal metropolitan areas, cities, and industries, and to serve national defense. It is in effect a network of the most important arteries of interstate highway transportation carved out of the primary system and including urban links which are also in the urban category. It is therefore eligible to receive both primary and urban funds as well as funds from the interstate category.”
A gigantic substantive change created by said 1956 Federal-Aid Highway Act was the assumption by the Federal Government of 90% of the cost of the interstate highway system. Let me emphasize that it was 90%. This 90% program was to continue for 13 years. During such period of time, New York State would be required to pay only 10%.
In anticipation of this national generous assumption of the funding of highway programs, the defendant State was revising its own financial plans to enable it to receive the billions of dollars being made available for it through this medium. By chapter 761 of the Laws of 1956, the State Legislature passed and Governor Harriman approved a proposition for a $500,-000,000 bond issue for such eventuality. In the 1956 general election, that bond issue was approved by the voters of our State. This five hundred million dollars was required as the anticipated requisite 10% to ‘ ‘ match ’ ’ the awaited four and a half billion dollars from future national budgets.
As part of the schematic preparation to enable the defendant’s interstate highways program to utilize the benefits of said 1956 Federal-Aid Highway Act, a new section of our Highway Law, section 340-b headed “ Construction, improvement and maintenance of state interstate highways ”, was enacted by chapter 651 of the Laws of 1956, as part of ‘ ‘ Article Xll-State Routes ”. There was no separate provision therein for New York City.
In the following year, by chapter 707 of the Laws of 1957, said section 340-b was amended in a number of particulars. One instance was at the end of subdivision 4 thereof. The (third) then final sentence of subdivision 4 was amended to read: ‘ ‘ The proportion of the total cost of work performed on any interstate project, in addition to such elements thereof as are not subject to federal aid, which shall be borne by the state of New York shall be the difference between the funds contributed for such work by the federal government and the actual cost thereof.” There followed a new sentence of some significance: “ No city shall be required to participate in the costs of an interstate highway project, whether or not the alignment coincides with the alignment of a previously approved arterial *528 route, except for those costs which are incurred under any special cooperative agreement between a city and the state.”
For the interstate highways within the City of New York, a new subdivision 5 became law for the first time: “ 5. Any property in the city of New York which is deemed by the superintendent of public works and the city of New York to be necessary for the construction, reconstruction and maintenance of interstate highways shall be acquired by the city of New York in the same manner as provided in section three hundred forty-nine-c of this chapter relating to the acquisition of property for the state arterial system in the city of New York, except that the city shall be reimbursed in full for the costs and expenses incurred by such acquisitions for interstate highways subsequent to the enactment of the federal aid highway act of nineteen hundred fifty-six, in the manner as provided in section three hundred forty-nine-c of this chapter relating to reimbursement of costs and expenses of acquisitions for the state arterial highways. Upon the completion of construction by the state of a section or sections of interstate highways in the city of New York, the ‘superintendent of public works may by official order transfer jurisdiction for maintenance of interstate highways or completed portions thereof to the appropriate agency of the city of New York.”
Former subdivision 5 was amended to become new subdivision 6, with additional specific reference to the Federal-Aid Highway Act of 1956 and to make certain that our roads whether designated as “ state highways ” or “ arterial highways ” would benefit from said federal funnel of funds. As amended, subdivision 6 read: “6. All the provisions of this chapter relating to state highways and state arterial highways and not inconsistent with the provisions of this section or with the provisions of the federal-aid highway act of nineteen hundred fifty-six, shall apply to the construction or improvement and the control or maintenance of interstate highways in the same manner as though they were designated as state highways or arterial highways.”
Thus, in the basic subdivision 5, we have the impressive prescription “ that the city shall be reimbursed in full for the costs and expenses incurred by such acquisitions for interstate highways subsequent to the enactment of the federal aid highway act of nineteen hundred fifty-six”. This is the fundamental weave of the legal texture before us. It is my opinion that the succeeding language at the end of said sentence ‘ ‘ in the manner as provided in section three hundred forty-nine-c of this chapter *529 relating to reimbursement of costs and expenses of acquisitions for the state arterial highways ” refers to the procedural machinery specifically recited in section 349-c. The vitality of all of this appears with great clarity to me. I do not agree with the State’s contention that said subdivision 5 is infected by a restrictive period of one year for interest.
Indeed, in Governor Harriman’s memorandum approving that bill which became chapter 707 of the Laws of 1957 (amdg. § 340'-b, including new subd. 5), he wrote unequivocally: “ This bill effectuates my Administration’s policy to relieve Cities of the obligation to participate in the cost of property acquisition for interstate highway routes within cities.
“ This bill makes the acquisition of land in the construction of such interstate highways the complete responsibility of Federal and State Governments, with costs assumed by the Federal Government for 90 per cent, by the State for 10 per cent. The bill makes it clear that the Cities are relieved from contributing 50 per cent of the cost of the rights of way which are now required under the Urban Arterial Law. ’ ’ (N. Y. Legis. Annual, 1957, pp. 510-511.)
The last sentence reaffirms the substantive financial changes from the State arterial system to the interstate highways program. For arterial highways (before the tremendously increased Federal funds), the city and State had been paying 50-50. By the new provisions applicable to interstate highways, the city was not to make any financial contribution whatsoever. Instead, it was newly provided that the Federal Government would pay 90% and the State 10% whether the roads were “ state highways or arterial highways
From the record before me, it appears that in 1961 there were considerable correspondence and other writings among the distinguished counsel and high ranking personnel of the parties hereto and the Triborough Bridge and Tunnel Authority through which the claimant had been acting. These are Exhibits 1-15 attached to defendant’s moving affidavits on its cross motion to dismiss. (Said exhibits were not numbered chronologically. For clarity of sequence, I had copies rearranged according to their dates.)
Exhibit 4 thereof is the letter dated October 5, 1961 from the State’s Attorney-General to its Department of Public Works, ending with said writer’s “ opinion that the City of New York cannot be reimbursed for interest on awards in condemnation for property acquired pursuant to Highway Law, § 340-b, subd. *530 5 for a period in excess of one year from the date of vesting, of title.” (See 1961 Opns. Atty. Gen. 38, 41.)
That ‘ ‘ opinion ’ ’ letter generated much abortive legislative work initiated by the city in a gentlemanly endeavor to obviate the unacceptable discord between the high ranking officials of the litigants herein. The defendant’s initial memorandum of law submitted to me contains an excellent Appendix A detailing seriatim the specific bills introduced in 1962 and each year thereafter through both houses of our 'State Legislature to amend either subdivision 3.3 of section 349-c or subdivision 5 of ■section 340-b.
Not until 1965 did both houses pass any such bill. In that year, they adopted Senate Bill, Intro. 1948, Pr. 2905 (amending said subd. 3.3) and Assembly Bill, Intro. 3137, Pr. 3162 (amending said subd. 5). However, on June 14, 1965, Governor Rockefeller disapproved the Senate bill and on July 15, 1965, the Assembly bill. One perceives a continuation of the State’s posture.
It will serve no useful purpose to continue the recital of subsequent legislative endeavors and their respective failures of passage until 1968 when one bill was vetoed and another amending subdivision 3.3 was approved by the Governor. Said amendment was prospective. In my opinion, it cannot be applied to the case before me or any portion thereof.
The defendant has argued strenuously that the city’s annual requests for legislative help are tantamount to elements of estoppel or were in the nature of admissions, and that therefore the city’s contentions at bar are infected fatally. I do not agree. It is time-honored to avoid litigation by legislative enactment. Indeed, this is a sophisticated approach. There are two means of attaining a legal disposition. One is by litigation; the other, by legislation.
To declare that one’s rights are destroyed if fulfilling legislation is sought, would cause a preclusion of resort to legislative channels. To so rule would be contrary to the judicial concept of the constitutional potency of the State’s Legislature. I accord no vitality to this contention of defendant.
There was also a question of constitutionality argued orally and extended in the memoranda, with respect to ‘ ‘ incorporation by reference”. (As discussed, the city’s prime position was that the language of “ in the manner ’ ’ used in subdivision 5 of section 340-b, was only a procedural reference to section 349-c.) The city’s additional legal thrust re the quoted phrase also *531 asserted that the incorporation by reference to section 349-c violated section 16 of article III, of onr State Constitution. The cited section provides:
“ § 16. [Existing law not to be made applicable by reference.] No act shall be passed which shall provide that any existing law, or any part thereof, shall be made or deemed a part of said act, or which shall enact that any existing law, or part thereof, shall be applicable, except by inserting it in such act.5 ’
In my judgment, such attack is not persuasive. On this legal issue, I agree with the State’s position as succinctly set forth in the penultimate paragraph of 1961 Attorney-General’s opinion: ‘ ‘ Although the State Constitution, Article 3, § 16, contains a prohibition against the inclusion by reference in any act of any existing law, or part thereof, except by inserting it in such act, the cases hold that such prohibition does not apply to procedural matters. People v. Lorillard, 135 N. Y. 285 (1892); Knapp v. Fasbender, 1 N. Y. 212, 234 (1956). It would seem quite clear that the matters so included here are matters of procedure. This being so, there is no Constitutional Violation found in the above-quoted subdivision of § 340-b.” (1961 Opns. Atty. Gen. 38, 41.) (This was part of the said official’s letter opinion [Exhibit 4 of defendant’s cross-moving papers] dated October 5, 1961 in response to the Department of Public Works’ letter of August 25, 1961 which is not in this record.)
People ex rel. Everson v. Lorillard (135 N. Y. 285 [1892]) involved a judicial construction of chapter 249 of the Laws of 1890. The statute provided for the city’s acquisition and improvement of “ lands in connection with Washington bridge, over the Harlem river ” and required the application to our Supreme Court ‘ ‘ for the appointment of three disinterested persons, * * * as commissioners of appraisal, to ascertain and appraise the compensation to be made to the owners and all persons interested in the real estate ”. There followed the attacked sentence: “ Such proceeding shall be had upon the said application, except that the same shall be in the first judicial district, as are provided for the acquisition of real estate by chapter 490 of the Laws of 1883, and with the like effect, and all payments for the real estate so acquired and for the charges and expenses of acquiring the same, shall be made in the manner in which such payments are to be made and out of the moneys therefor to be raised, as provided in said last-mentioned act.”
Judge O’Briex, writing for the unanimous court, paraphrased the constitutional objection (pp. 287-288) : “ The difficulty sug *532 gested with respect to this statute is that while it authorizes the city to acquire lands it does not in extenso prescribe the procedure under which they were to be obtained, but for that purpose refers to another statute namely, chapter 490 of the Laws of 1883. The latter act is the one which confers power upon the city of New York to construct a new aqueduct and to acquire lands for that purpose. The provisions conferring the power to construct, the procedure under which the lands were to be acquired and the manner ip which the money was to be raised to pay for them are all set forth in that act.”
He expounded (p. 289): “ A constitutional provision, like a statute, should not be so construed as to work a public mischief, unless the language used is of such explicit and unequivocal import as to leave no other course open to the court, and when the intent of the lawmakers is ascertained that must prevail over the letter of the law. (Smith v. People, 47 N. Y. 330; People ex rel. Jackson v. Potter, id. 375; People ex rel. Killeen v. Angle, 109 id. 564.)
“ This court, in the case of People ex rel. Commissioners v. Banks (67 N. Y. 572) stated the purpose of this constitutional provision in this language: ‘ The evil in view, in adopting this provision of the Constitution, was the incorporating into acts of the legislature, by reference to other statutes, of clauses and provisions of which the legislators might be ignorant, and which affecting public or private interests in a manner and to an extent not disclosed upon the face of the act, a bill might become a law which would not receive the sanction of the legislature if fully understood.’ ”
The last paragraph of the opinion declares (p. 291): “ When a statute in itself and by its own language grants some power, confers some right, imposes some duty, or creates some burden or obligation, it is not in conflict with this constitutional provision because it refers to some other existing statute, general or local, for the purpose of pointing out the procedure, or some administrative detail, necessary for the execution of the power, the enforcement of the right, the proper performance of the duty, or the discharge of the burden or obligation. In this case the main object of the statute was to confer power upon the city to acquire land for a certain purpose, and that power is expressed in appropriate language, but the procedure, by means of which the lands were to be condemned, and the administrative acts on the part of the city authorities, necessary in order to procure the money for the payment of the awards, are designated by reference to another statute.”
*533 The Court of Appeals affirmed the Appellate Division’s order which had affirmed the Special Term order directing the requested preemptory writ of mandamus against the city’s corporation counsel.
As quoted (p. 291): ££ the procedure, by means of which the lands were to be condemned, and the administrative acts on the part of the city authorities, necessary in order to procure the money for the payment of the awards * * * designated by
reference to another statute ” were determined to be constitutional. How apposite and felicitous are .such language, reasoning and conclusion. For over 75 years this opinion has been quoted and cited. I follow said ruling in holding that “ in the manner ’ ’ relates to ‘1 procedure ’ ’ and ‘ ‘ the administrative acts on the part of the city authorities ’ ’.
It is of great interest to observe that to sustain the constitutionality of .subdivision 5 of section 340-b, the Attorney-General opines in his October 5, 1961 answer to the Department of Public Works letter, that the inclusions by reference “ are matters of procedure but in the immediately preceding paragraph of his letter, he argued that “m the same manner” includes ‘£ a limitation as to interest ’ ’ which £ £ must be deemed to be a part of the interstate statute, and a limitation on the manner of reimbursement.” (1961 Opns. Atty. Gen. 38, 41.)
The last-quoted unsupported conclusion of ££ a limitation as to interest ” is impotent. It emasculates the method for reimbursement, the procedural machinery, to attain an aura of legal respectability for an invalid construction of a substantive matter.
It is my decision that the State was liable to the city for interest reimbursement on condemnation awards for property acquisitions pursuant to subdivision 5 of section 340-b of the Highway Law for the respective periods beyond one year from the date of each such title vesting. In so doing, I am not predicating this legal determination on the city’s approach that it suffers from the State’s discrimination herein because ££ The City is the only agency in the State and Nation which is deprived of the 90% reimbursement by the federal government for all interest costs ” (claimant’s reply affidavit, par. 11) even though this factor is not disputed by affidavit or in the briefs. My decision herein is one of law.
n.
Next, we attend to the defendant’s attack on the forum, a jurisdictional assault. It is averred that claimant has misplaced the proper place for judicial determination. The defendant *534 argues that its adversary’s remedy was an article 78 proceeding in the Supreme Court of our State. I disagree.
Article 78 of the CPLR is significantly headed “ Proceeding Against Body or Officer”. A reading of section 7801 et seq. demonstrates the inapplicability of such relief to the situation herein. The State’s contention is bottomed on the October 5, 1961 opinion (Exhibit 4, cross motion papers) of its Attorney-General written to its Department of Public Works.
It begins: “ This is an answer to your letter of August 25, 1961, requesting my opinion^ ” (emphasis added). As noted, it concludes “It is therefore my opinion” (emphasis added). I conclude that this “ opinion ” in which a lawyer (the State’s elected law officer, its Attorney-General) was giving advice to his client (the State’s Department of Public Works), cannot be elevated to a “determination” veiewable by an article 78 proceeding.
Moreover, here there was no “record” made in the legal sense of the term, there was no “ adversary proceeding ” pending, the city was not a party of any proceeding before said Attorney-General, and his ‘ ‘ opinion ’ ’ (his own iterated word) was not a final determination. Indeed: there have been historic instances in which a State official, e.g., a Superintendent of Public Works or a State Comptroller, has disagreed with an opinion of the highest legal officer of the State.
The Court of Claims of the State of New York (in which this case was instituted) is the proper forum to determine this controversy. The court exists in our State as a true example of enlightenment and liberality; this State being one of the very few throughout the country in which by statute a sovereign State can be sued. Our Court of Claims Act provides: “ § 9. Jurisdiction and powers of the court. The court shall have jurisdiction: * * * 2. To hear and determine a claim of any person, corporation or municipality against the state * * * for the breach of contract, express or implied * * * providing the claimant complies with the limitations of this article.”
In my opinion, the pertinent portions of the Highway Law created an implied contract between the parties at bar, enforceable in this court. (Raisman v. Ashford Roofing Co., 261 App. Div. 782; D'Angelo v. State of New York, 285 App. Div. 29, affg. 206 Misc. 1007.)
From all of the foregoing, it is my conclusion that this court is the rightful forum in which such liability and the amount thereof should be determined,
*535 III.
We now come to the final question of law presented on these motions, i.e., was the claim (pleading) timely filed at bar?
As noted, this is a court of limited jurisdiction. When the State created this court wherein the sovereign State could be sued, there were limitations imposed. One of these statutory limitations relates to the time of institution of suit. The applicable provisions of the Court of Claims Act read: “ § 10. Time of filing claims and notices of intention to file claims. No judgment shall be granted in favor of any claimant unless such claimant shall have complied with the provisions of this section applicable to his claim. * * * á. A claim for breach of contract, express or implied and any other claim not otherwise provided for by this section, over which jurisdiction has been conferred upon the court of claims, shall be filed within six months after the accrual of such claim, unless the claimant shall within such time file a written notice of intention to file a claim therefor in which event the claim shall be filed within two years after such accrual. ’5
At bar, no written notice of intention was filed, but the claim (verified on March 7,1967) was filed on March 9,1967. Accordingly, only if the city’s cause of action accrued within six months prior to said filing date, can the case be deemed timely instituted.
In its cross motion to dismiss the claim, the defendant argues that claimant’s cause of action accrued on October 6, 1961 when it received a copy of the Attorney-General’s “ opinion ” dated October 5, 1961 (Exhibit 4, cross motion papers). I do not agree. Neither said letter of opinion nor the contents thereof can be regarded as having created a cause of action or having enabled a cause of action to accrue, i.e., having initiated a period of time within which to sue.
Nor do I approve the claimant’s contention that its cause of action accrued on January 13, 1967, i.e., 60 days after the November 14, 1966 letter (Exhibit “B ”, part of filed claim) from the city’s Corporation Counsel to the State Comptroller. The January date was arbitrarily, peremptorily and illegitimately procreated.
Apparently that letter was accompanied by Exhibit “A” (similarly part of the filed claim) setting forth details purportedly aggregating the demanded $1,696,692.61 at bar. In ¡¡¡aid Exhibit “A” under the heading “Requested”, there appear specific dates alongside of each of the denoted 86 partial or final decrees or supplements thereto. These dates appear to *536 be requests (for payments) ranging from August 30, 1960 through April 22, 1966.
Of these alleged dates, 1 was in 1960, 25 in 1961, 34 in 1962, 15 in 1963, 4 in 1964, 6 in 1965 and 1 in 1966. The claim (pleading) herein was filed on March 9, 1967. Certainly as to the amounts requested during the years prior to 1966, it must be said that they had become stale legally.
The quoted subdivision 4 of section 10 of the Court of Claims Act clearly provides that a claim ‘ ‘ shall be filed within 6 months after the accrual of such claim ’ In the voluminous papers before me, there is no disclosure by claimant of any “ date of vesting title ” in any of the numerous city appropriation cases involved at bar. Claimant does not supply .such date even with respect to the only 1966 request for payment, i.e., the April 22, 1966 request. Indeed, claimant has not even pleaded when it paid the now demanded interest to any owner or owners of real property in the city condemnation cases.
There may well be an issue as to whether the city’s April 22, 1966 request of the State was made within a reasonable time. However, even assuming that the city’s request was made within a reasonable time, we then arrive at the threshold of the next question: At bar, what was a reasonable time for the defendant to audit this unit of the claim?
The leg’al answer is that each situation depends on the specific facts involved therein. (Terry Contr. v. State of New York, 23 N Y 2d 167; Merritt-Chapman & Scott Corp. v. State of New York, 25 A D 2d 455; Tennessee Gas Transmission Co. v. State of New York, 32 A D 2d 71.)
It is my ruling that under the instant circumstances, two month's would have been a reasonable time for the State’s audit herein. (Realistically, we are aware that the factual details were matters of record [filed papers and receipts] which can be checked readily. The legal question was of long-standing consistency.) Adding said two months to April 22, 1966 would bring us to June 22, 1966. Utilizing the six month’s yardstick in said subdivision 4 of section 10 of the Court of Claims Act, carries us to December 22, 1966. The claim for the April 22, 1966 request should have been filed on or before said December 22,1966. As noted, this claim was not filed until March 9, 1967. I agree with this facet of the defendant’s cross motion which asserts that the claim was not timely filed.
There is another aspect of timeliness requiring determination. In its moving papers and memoranda, claimant alludes to the fact that the defendant has served no answer herein. It is my impression that said statement and reference constitute a *537 tactical approach. Claimant’s counsel is well aware that in this court, a defendant need not serve an answer. Bule 13 of our rules provides: “ The state is not required to answer a claim and all allegations in the claim are treated as denied.” (22 NYCRR 1200.14.)
Claimant’s obvious thrust relates to the burden of proof. Does the claimant have the burden of proving that its claim was filed timely, or must the defendant prove untimeliness % The principle of law involved, the adversary contentions, the reasoning employed and the ultimate ruling all appear in the recent (1967) opinion of Judge Bergan writing for the unanimous court in Romano v. Romano (19 N Y 2d 444). Although that was a matrimonial case with a factual situation in no way comparable to the one at bar, the legal concept is relevant, indeed.
In Romano, as appears from the beginning of Judge Bergan’s opinion (p. 445): “ The parties were married on January 6, 1950. Plaintiff alleges her consent to the marriage was induced by fraudulent representations of defendant and she left him in August, 1950, promptly on discovery of the fraud. This action was not commenced, however, until November 1964, more than 14 years after her discovery of the fraud. Defendant husband defaulted and has never appeared in the action.
I ‘ The Appellate Division was of opinion the fraud had been sufficiently shown; but it affirmed the dismissal of the action by the court at Special Term on the ground the three-year period fixed for the commencement of an action to annul a marriage for fraud is a part of the cause of action itself and not merely a limitation to be established as a defense. ’ ’
After a discussion of the history of the statutes involved, the opinion continues (p. 446): “ The important question raised by this case is, then, whether the time limit for the commencement of the action is an inherent part of the cause of action itself; or whether the time stated is to be looked at as providing a Statute of Limitations. The two concepts are different and they have a different procedural consequence.
‘£ If time is integral with the cause of action, the plaintiff must establish as part of his case that three years have not gone by since he discovered the fraud, and this whether or not the defendant defaults. If the time stated is merely a Statute of Limitations, the plaintiff has no obligation in respect to the three-year period which must be established affirmatively by a defendant who contests the action.
II The general rule, which has rather wide acceptance, may be simply stated: If a statute creates a cause of action and attaches *538 a time limit to its commencement, the time is an ingredient of the cause. If the cause was cognizable at common law or by other statute law, a statutory time limit is commonly taken as one of limitations and must be asserted by way of defense.
“ This statutory provision could be seen as a sort of condition precedent, but it is probably more accurately described as one of the ‘ Qualifications Annexed to Given Right ’, a concept developed in Corpus Juris Secundum (Vol. 53, Limitations of Actions, § 1, subd. 2, par. [c], p. 904): ‘ A wide distinction exists between pure statutes of limitation and special statutory limitations qualifying a given right in which time is made an essence of the right created and the limitation is an inherent part of the statute or agreement out of which the right in question arises, so that there is no right of action whatever independent of the limitation; a lapse of the statutory period operates, therefore, to extinguish the right altogether.’ ”
In our- case, there never was a common-law cause of action permitting a lawsuit against a sovereign. In this State, such right is purely the creation of statute. (It is a much more recent law than the statutory provisions for an annulment action.) Judge Bergan continues in Romano (p. 448):
“ Therefore, the time fixed in the statute must be treated as a qualification annexed to the created right (Gatti Paper Stock Corp. v. Erie R.R. Co., 247 App. Div. 45, affd. 272 N. Y. 535; Fairclough v. Southern Pacific Co., 171 App. Div. 496). ‘ Generally, where a 'statute creates a cause of action which was unknown at common law, a period of limitation set up in the same statute is regarded as a matter of substance, limiting the right as well as the remedy.’ (Frank, J., in Osbourne v. United States, 164 F. 2d 767, 768.)
‘ ‘ Illustrations of the operation of the principle may be seen in the decisions of many States. Time requirements of this kind are regarded as ‘ in the case of a condition put by the law upon a substantive right given ’ (Guy v. Stoecklein Baking Co., 133 Pa. Super. Ct. 38, 45). See, also, Wheatland v. Boston (202 Mass. 258); Tischer v. City of Council Bluffs (231 Iowa 1134); Roberts v. Title Ins. & Trust Co. (6 Cal. 2d 373); Lane v. Department of Labor & Inds. (21 Wn. [2d] 420).
“ There have been differences in view within the New York Supreme Court on the question whether the time fixed in the statute creating the right of annulment is an integral part of the statute or is to be treated as a Statute of Limitations. (Compare Rogers v. Rogers, 19 Misc 2d 487, with Shoddy v. Shoddy, 50 Misc 2d 74; Guido v. Guido, 12 Misc 2d 549, and Ackerman v. Ackerman, 35 Misc 2d 890.) The earlier views expressed *539 in McNair v. McNair (140 App. Div. 226) and in Kaiser v. Kaiser (16 Hun 602) bear some collateral relation to the subject. We have reached the conclusion, however, that the Appellate Division was right on this branch of the present case.”
In our case, ‘ ‘ the time limit for the commencement of the action is an inherent part of the cause of action itself” and is ‘1 not merely a limitation to be established as a defense. ’ ’ The time element was “integral with the cause of action”. This essential feature must be established as a part of claimant’s case; “ the time fixed in the statute must be treated as a qualification annexed to the created right ’ ’. As here, ‘ ‘ where a statute creates a cause of action which was unknown at common law, a period of limitation set up in the same statute is regarded as a matter of substance, limiting the right as well as the remedy. ” It is my legal determination that the claim at bar was not timely instituted.
The claimant had the obligation to serve and file its claim on time within the applicable statutory limitation. This burden was not sustained by the claimant. For said reason, this claim must be dismissed.
CONCLUSIONS
The claimant has failed to plead and has not proven that it had any cause of action which accrued and was instituted against the defendant within the limited statutory period prior to the filing (and service) of the claim at bar. The claim herein is dismissed because it was not filed within the time limited by law.
The claimant’s motion for summary judgment in its favor against the defendant, is denied. The defendant’s cross motion to dismiss this claim, is granted.