STATE of Missouri ex rel. STATE HIGHWAY COMMISSION of Missouri, Plaintiff-Appellant,

v.

CITY OF ST. LOUIS and John H. Poelker, Mayor, Defendants-Respondents.

No. 38235.

Missouri Court of Appeals,
St. Louis District,
Division Two.

Oct. 31, 1978.

Motion for Rehearing and/or Transfer to Supreme Court Denied Dec. 15, 1978.

Application to Transfer Denied
Feb. 13, 1979.

John H. Gladden, State Highway Comm., Joplin, Bruce A. Ring, State Highway Comm., Jefferson City, for plaintiff-appellant.

Donald L. Schlapprizzi, Alfred Lebowitz, St. Louis, for defendants-respondents.

STEWART, Judge.

The relator, State Highway Commission of Missouri (Commission) brought suit for breach of contract against the City of St. Louis, its Mayor, its Comptroller and Travelers Insurance Company as surety on the bond of the Comptroller. We shall refer to defendants as City. City filed a counterclaim for damages contending the contracts sued upon by Commission and other contracts of the same nature were the result of duress. The verdict of the jury was in favor of City on Commission's action and in favor of City for $13,861,810.00 and $4,114,-647.25 interest on City's counterclaim. Commission appeals from the judgment entered on the verdict. We reverse and remand as to Count IV of Commission's petition and affirm in all other respects.

The Commission's petition in four counts alleges that between 1958 and 1966 it entered into four contracts with City in which City agreed to pay a percentage of the acquisition costs of rights-of-way for that portion of urban highway construction projects within the City of St. Louis. The contracts alleged in Counts I and III called for payment of 50% of the acquisition costs and those alleged in Counts II and IV call for 10% of such costs.

The highways were being built in accordance with the provisions of the Federal-Aid Highway Act 23 U.S.C. § 101 et seq. The percentage of the acquisition costs required by the contracts represented the percentage of those costs which the Commission would not receive by way of reimbursement from the Federal Government.

City filed an answer and counterclaim. As pertinent to our discussion City's answer raised the affirmative defenses of duress and ultra vires. We note at this point that at the time of submission the defense of ultra vires was abandoned as to Counts I, II and III. City's counterclaim alleged that it had entered into the four contracts sued upon by Commission and other contracts [1] with the Commission under duress and

---

1. In all there were eleven contracts introduced into evidence by the City. Four by Commission.

sought recovery of the sums paid by it to the Commission.

Many of the facts were admitted by the parties by way of stipulation. They agreed as to the identity of the four contracts sued upon by Commission; that the contracts were executed by persons generally authorized to execute such contracts; that the amounts sued for by the Commission were the amounts remaining unpaid under those contracts;[2] that Commission had acquired and paid for all of the right-of-way referred to in the contracts and that all of the right-of-way acquired was within the City of St. Louis; that all of the highway projects involved had been completed and that Commission has complied with the terms of the contracts in all other respects.

The parties further stipulated that City had paid a total of $13,861,810.00 to Commission on the various projects. Of that amount the sum of $5,022,984.97 was paid on the four contracts sued upon by Commission.[3]

It was further stipulated that City was required by the Commission to comply with those regulations of the Commission that required City to pay the percentage of the cost of acquisition of right-of-way set out in the contracts on all projects as a condition precedent to the commencement of construction of the highway project. Commission drafted all of the contracts involved in this action and the terms with respect to the percentage of payment and the requirement that payment be made were not negotiable.

The additional facts which we set out hereafter will be viewed in the light most favorable to City, the prevailing party. *Parker v. Stern Bros. & Co.*, 499 S.W.2d 397 (Mo.1973).

Prior to 1950 the Commission adopted a policy requiring cities having a population in excess of 5,000 to pay a portion of the cost of right-of-way acquisition. This poli-

cy prevailed with insubstantial modification until January 12, 1968.

The highway construction projects are based upon need. It is apparent, from the fact that the contracts presented to City had designated routes for acquisition, that the various highway projects underlying the contracts involved in this litigation had been planned before the contracts were submitted to City by Commission.

Commission urges eleven primary issues for our consideration. We consider the points raised in the posture in which they are presented to us.

Commission's principal contentions are that the trial court should have directed a verdict in its favor on each count of its cause of action and in its favor on City's counterclaim because "there was no substantial evidence to show coercion and duress by [Commission] against [City's] legislative body, the Board of Aldermen, in obtaining the execution of the contracts sued on in . . . [Commission's] petition."

We first consider the basic elements of "duress." In Missouri it is said that the question of duress is one of fact in the particular case. As the court said in *Coleman v. Crescent Insulated Wire & Cable Co.*, 350 Mo. 781, 168 S.W.2d 1060 (1943) 168 S.W.2d l. c. 1066:

> "The question is: Was the person so acted upon by threats by the person claiming the benefit of the contract, for the purpose of obtaining the contract, . . . and was the contract thereby obtained. So duress is to be tested, not by the nature of the threats, but rather by the state of mind induced thereby in the victim. The ultimate fact in issue is whether the alleged injured party was bereft of the free exercise of his will power; and of which, the means used to produce such state of mind, the age, sex, capacity, situation, and relation of the parties, are all evidentiary."

---

2. "Damages were alleged as follows: Count I—$54,390.64; Count II—$75,663.81; Count III—$1,196,231.97; and Count IV—$2,227,327.18."

3. The balance of the stipulated $13,861,810.00 was paid under 11 separate contracts of the same nature from 1953 through 1962.

The court in *Coleman* also took note of the fact that the victim of duress "acts knowingly but unwillingly because of the coercion . . ." and he may continue to be submissive to the threatened force which caused him to act after the action has accrued.

■ It is admitted that the provision of the contracts requiring City to make payment for the costs of right-of-way was part of the contract because of a policy of the Commission which was passed by resolution of the board. The policy has the effect of a rule or regulation of an administrative body. § 536.010(4) RSMo. The policy ostensibly had the force and effect of law. It was stipulated by the parties that City had to comply with the policy of the Commission or Commission would not commence construction of that portion of the highway project within the City of St. Louis. A number of letters to City from Commission indicate a reluctance on the part of City to enter into one of the contracts because of lack of funds. In one instance City sought a modification of the contract so as to provide that City make payments under the contract "when funds are available and appropriated for such purposes." The Commission in reply requested that the "[c]ontract be executed as submitted . . ." In another letter in answer to a statement by City that it was not in a position to sign one of the contracts because of lack of funds, Commission said that no construction would be started within the City limits until the agreement was signed. It reiterated, "[T]his policy *will* be adhered to . . .,"

The contracts involved in this case extended over the terms of Mayors Tucker and Cervantes. Mayor Poelker was Comptroller, the fiscal officer of City, during this period and for most of the period Conway Briscoe was President of the Board of Public Service. Letters urging execution of the contracts and threatening to halt acquisition of the right-of-way and to withhold construction of the highways that were to be constructed within the City limits were sent to all of the above, with the exception of Mr. Poelker. Mr. Briscoe recommended that the contracts not be signed, but Mayor Tucker expressed the fear that if the contracts were not signed as presented the roads would not be built.

In addition to the Mayor, Mr. Poelker, as Comptroller, was required to sign all contracts. He was aware of the policy of Commission which required payment by the City for a portion of the cost of acquiring right-of-way. Mr. Poelker feared that if he did not sign the contract presented to him the roads would not be built.

■ It has been held that where a provision in a contract requires compliance with a statute which is unconstitutional that provision of the contract is unenforceable because it is not the result of the voluntary assent of the parties. *City of Cleveland v. Clements Bros. Const. Co.*, 67 Ohio St. 197, 65 N.E. 885 (1902). We believe that the principle enunciated in that case to be sound and that it is applicable to the facts of this case. As we shall demonstrate, the policy requiring City to pay part of the cost for acquiring right-of-way was invalid.

■ In the case at bar Commission, one of the contracting parties, was in a position to adopt policies which could have the force of law. When it adopted the policy requiring cities with a population in excess of 5,000 to pay for the cost of acquisition of right-of-way this policy ostensibly had the force of law. In view of the fact that the route of the highways had been determined the threats to discontinue acquisition of right-of-way and to withhold construction was not based upon its discretionary power to determine the route according to its standards but to force City to pay for the cost of right-of-way. When the Commission demanded compliance with its policy as a condition precedent to construction of highways within the limits of the City the policy did not become part of the contract by the voluntary act of City, but because Commission insisted upon compliance with its policy.

Commission would argue (1) only the person upon whom duress was exercised may take advantage of it to void the contract.

*Mississippi Valley Trust Company v. Begley*, 298 Mo. 684, 252 S.W. 76, 79 (banc 1923); (2) that only the Board of Aldermen had authority to contract; and (3) that there is no evidence that duress was exercised upon the Board of Aldermen.

■ We are not dealing with individuals but with a corporate entity. The inhabitants of the locality are its incorporators. The officers of the municipal corporation, both executive and legislative, are the agents and servants of the corporation through which it acts. *State ex rel., etc. Behrens v. Crismon, et al.*, 354 Mo. 174, 188 S.W.2d 937, 939 (banc 1945). Commission in this case undertook to communicate with the mayor and the president of the Board of Public Service, the head of the department responsible for streets and highways within the City of St. Louis. The contracts required by Commission were sent to the mayor. When there was a delay in the enactment of the ordinances and execution of the contracts the correspondence was directed to the mayor and the president of the Board of Public Service. These persons are agents of the City. Each has a function with respect to the process of contracting with the City. By the charter of the City of St. Louis, it is provided that no ordinance for public works or improvements shall be adopted unless prepared and recommended by the Board of Public Service. Art. XXII, Sec. 1, Charter of the City of St. Louis. The mayor has the veto power over all ordinances. The executive branch of the municipal corporation can be said to be the alpha and omega of the contracting process. The policy enacted by Commission with respect to acquisition costs, and the contacts and threats made by Commission with the various officers of City were directed at the corporation. At the time the contract is presented to the legislative body the negotiations have been completed. The enactment of the ordinance by the Board of Aldermen is but one phase of the contracting process. There was ample evidence that the action of Commission had coerced the corporate entity to enter into the various contracts with Commission.

The policy of Commission requiring City to pay a share of the cost of acquiring right-of-way unlawfully mandates payment by the cities. If the cities were to have the advantages contemplated by the Federal-Aid urban system of roads 23 U.S.C.A. § 103(d)(1) (Supp.1977), they were required by Commission to submit to the policy. The policy being mandatory acted upon every segment of the municipal corporation. It is thus apparent that even absent a direct personal contact with the Board of Aldermen the jury was warranted in finding that duress was exercised upon the Board of Aldermen by reason of the policy.

■ As previously stated the provisions of the contract respecting payments by City were not the result of the exercise of free will on the part of the City but by reason of the illegally enacted policy of the Commission coupled with the threat of depriving the City of highways which were determined to be needed by Commission. The payments made by City and the funds sought to be recovered were the result of terms of the contracts illegally imposed upon City as a condition to the construction of needed highways within City and constituted duress sufficient to nullify the provisions of the contract requiring payment for a portion of the cost of acquisition of right-of-way. *City of Cleveland v. Clements Bros. Const. Co., supra. See Simmons Hardware Co. v. City of St. Louis*, 192 S.W. 394, 396 (Mo.1916).

■ Commission further argues that a municipal corporation may not claim the benefit of the defense of duress relying on *Dallasta v. Department of Highways of the State of Colorado*, 153 Colo. 519, 387 P.2d 25 (banc 1963). The case does not stand for the sweeping declaration of law espoused by Commission. It merely holds that "the passage of an enactment by a body duly constituted and acting within its authority is not vitiated or rendered void by reason of well known 'lobbying' activities in the legislative halls." *Id.* 387 P.2d at 26. That *Dallasta* is readily distinguishable needs no extended discussion. It is generally held that "[c]ontracts made by a city, if autho-

rized, are no different from other contracts and are measured by the same tests and subject to the same rights and liabilities." *Burger v. City of Springfield*, 323 S.W.2d 777, 783 (Mo.1959). It is also said that "a municipal corporation may avail itself of any defense appropriate to the nature of the action and the facts of the case." 63 C.J.S. Municipal Corporations § 1024 at 614. Under the facts of this case duress was available to City as a defense and presented a viable basis for its counterclaim.

We must next determine whether Commission unlawfully exceeded its powers in establishing the policy of requiring payment from City.

■ The State Highway Commission is vested only with such powers as are specifically conferred upon it by the constitution and statutes, as well as those implied powers which are necessary or proper to enable it to carry out fully and effectively the purposes of the act. *State ex rel. St. Louis County v. State Highway Comm'n*, 315 Mo. 707, 286 S.W. 1, 2 (banc 1926).

■ The Highway Commission is established by Article IV, Section 29, Const. of Mo. (1945) and is granted "authority over and power to locate, relocate, design and maintain all state highways . . . subject to limitations and conditions imposed by law as to the manner and means . ." The source of Commission's funds are enumerated in Art. IV, Section 30(b) as "revenue derived from highway users" and includes state license fees and taxes on motor vehicles, trailers and fuels. Commission is also empowered by Art. IV, Section 31 to enter into contracts with cities and other subdivisions "for and concerning the maintenance of, and regulation of traffic on any state highway within such cities, counties or subdivision." We can find no express or implied provision in these sections of the constitution that would permit the exaction of funds from cities by Commission for the purpose of acquiring right-of-way.

Chapters 226 and 227 RSMo. implement the constitutional provisions discussed above. Section 226.220 established the "state road fund" which is to receive money and credits in addition to those enumerated in Art. IV, Sec. 30(b) Const. of Mo. (1945). These include proceeds of the sale of state road bonds, monies received from the federal government for highway purposes and from "[a]ny other source if they are held for expenditure by or under the department of highways or the state highway commission . . ." There is no grant of power in this provision to permit Commission to impose payment by a City for any highway purpose.

Commission relies upon § 227.170 and § 227.180 RSMo. As necessary to our consideration § 227.170 provides:

"Any civil subdivision . . . shall have the power, right and authority, through its proper officers, to contribute out of funds available for road purposes all or a part of the funds necessary for the purchase of right of ways for state highways, . . ."

§ 227.180 authorizes Commission to receive the funds that may be contributed in accordance with § 227.170. We find no authority in these statutes that would permit Commission to mandate payment for the acquisition of right-of-way. The City, by § 227.170, is authorized to make contributions to the Commission for the purposes set out in its discretion and in the exercise of its free will.

The Supreme Court in *Pohl v. State Highway Commission*, 431 S.W.2d 99, 103, n.4 (Mo. banc 1968) referred to the funds acquired by Commission under § 227.170 as donations made by political subdivisions. These statutes provide no authority for Commission's policy. Whether or not the Commission has the implied power to exact a charge from a municipality for right-of-way costs under any of these provisions or under § 227.030 RSMo., which authorizes the Commission to make "all rules and regulations . . . necessary . . . for carrying out all of the provisions of this chapter . . .," depends upon whether such a power is "necessary to the just and reasonable execution of the power expressly conferred . . ." *State ex rel. State*

*Highway Comm'n v. Union Electric Co.*, 142 S.W.2d 1099, 1101[2] (Mo.App.1940). There the court held that the right to exact a charge from a public utility for placing a utility line along a public bridge could not be implied as necessary to the execution of the Commission's duty to prevent interference with traffic and highway construction. The expressly conferred power to receive donations from a municipality does not imply the power to compel the municipality to make such a donation. This view is bolstered by the language of § 227.030 RSMo., which limits the authority of the Commission to those steps "consistent with . . funds available."

Commission next contends that the court should have directed a verdict for it because "[t]here was no evidence that Respondent has restored or offered to restore Appellant to the position existing prior to the execution of the contracts involved in Appellant's Petition as required by law before a party may seek to void contractual obligations by reason of duress."

In *Bride v. City of Slater*, 263 S.W.2d 22 (Mo.1953), relied upon by Commission, the City and Bride entered into a contract by which Bride was to furnish fuel oil to City. The contract was void for failure to state the consideration as required by § 432.070 RSMo. By counterclaim the City sought to recover the monies it had paid for fuel oil which was delivered to and consumed by City. The court quoted with approval remarks made by a text writer that to lay down broad principles with respect to the matter of recovery of payments by municipalities would be "an exceedingly dangerous undertaking." *Id.* at 27. Stressing the

fact that payments in that case were voluntarily made, there was no contention that the payments were not fair and reasonable or that there was fraud on the part of the contractor; the court said l. c. 28: "In these circumstances (and limiting our decision to the circumstances of our case), we apply the recognized rule that a municipality cannot accept the benefits of a void contract and retain them and recover back the consideration paid."

█ As distinguished from *Bride*, City did not voluntarily pay for the cost of acquisition of the right-of-way, but the contract, as found by the jury, was executed by City under duress. The route of the highways was not a commodity to be sold by Commission to City. While Commission has great discretion in selection of the route of a highway, as stated by Commission, the route is to be selected based upon need. The portion of the Federal Act under which the State was obtaining aid was directed toward the development of highways in urban areas.[4] We may infer that Commission was acting to fulfill the purposes of the Act and its own policy of need in selecting routes and proceeding to acquire the right-of-way. It follows that once the route has been determined the Commission in constructing the highway was not parting with something it had a right to retain and City was receiving nothing but what it has a right to receive. Under such circumstances there is nothing to be restored to Commission or to be tendered as a condition to City's right to recover the sums previously paid by City. The factual situation in this case calls for the application of the rule announced in *Mack v. Acacia Mutual Life*

4. 23 U.S.C.A. §§ 103(d)(1), 134 (Supp.1977).
  *See also* Congressional Comments to Federal-Aid Highway Act of 1944, [1944] U.S.Code Cong. Serv. p. 1345.
  "The committee was advised that certain States are finding it increasingly difficult to improve the extensions of the Federal-aid secondary system into urban areas because of the small amount of urban funds available and the higher priority for the use of such funds for arterial street improvement in these urban areas. This creates a hardship in the outlying sections of the larger urban areas where there

is rapid suburban expansion, and in smaller cities where the urban extensions of secondary routes do not carry a sufficiently large volume of traffic to merit high priority on available urban funds. As a result, in many cases secondary routes are improved up to the urban limits, and urban funds are not available for their improvement within the city. This was one of the conditions that led to the establishment of the urban system in 1944." Legislative History, Federal-Aid Highway Act of 1962, [1962] U.S.Code Cong. & Admin.News, pp. 3938, 3963.

*Ass'n,* 228 Mo.App. 212, 65 S.W.2d 1045[2] (1933), where it was said, 65 S.W.2d l.c. 1047: "if it appears that the party on the one hand parted with nothing that he had a right to retain, and the party on the other hand receives nothing but what he has a right to receive, it follows that restoration is not necessary to right to sue." Commission's contention on this point must fail.

Commission challenges the giving of instructions No. 7, 10 and 13. Instruction 7 submitted City's defense of duress to each of the four counts of Commission's cause of action. Instruction 10 submitted City's counterclaim to recover for monies paid to Commission under the various contracts because the agreements to pay were the result of duress. Instruction 13 is City's damage instruction. The basis of Commission's complaint in each instance is that there was "insufficient evidence . . . of duress to justify submission [of the issue of duress] to the jury." What we have said above with respect to Commission's contentions that it was entitled to a directed verdict in its favor on its cause of action and upon City's counterclaim effectively answers Commission's present claims of error.

Instruction No. 12 defines duress. It reads:

"The term duress as used in these instructions means conduct by one party which so affects the state of mind of a second party that it prevents the exercise of free will by the second party."

Commission complains that the instruction "does not clearly and adequately define the term duress." While Commission's point relied on is vague in that it does not state wherein and why the definition is erroneous, we find that the definition is essentially that contained in *Coleman v. Crescent Insulated Wire & Cable Co.,* 350 Mo. 781, 168 S.W.2d 1060, 1066 (1943) where the court stated, "The question is: Was the person so acted upon by threats by the person claiming the benefit of the contract, for the purpose of obtaining the contract . . . and was the contract thereby obtained. . . . The ultimate fact in issue is whether the . . . injured par-

ty was bereft of the free exercise of his will power . . . ."

The instruction clearly and succinctly defines the term "duress." Commission's contention is without merit.

Commission next contends that the court erred in permitting Mayor Poelker, Conway Briscoe and Judge McGuire, who was formerly City Counselor, to testify that Mayor Tucker had expressed the fear that if the contracts involved in the action were not signed the Commission would stop acquisition of right-of-way and construction of the highways. Commission argues that this evidence is inadmissible hearsay because Missouri does not recognize the "state of mind" exception to the hearsay rule. In this Commission is mistaken. The state of mind of Mayor Tucker was relevant to the issues in this case. *Weisert v. Bramman,* 358 Mo. 636, 216 S.W.2d 430[1] (1948). It has been repeatedly held that statements by a deceased evidencing his state of mind, where relevant, though not admissible to prove the truth of the facts stated, are admissible to show his state of mind. *State ex rel. Smith v. Hughes,* 356 Mo. 1, 200 S.W.2d 360 (banc 1947). In *Rackers & Baclesse, Inc. v. Kinstler,* 497 S.W.2d 549, 554 (Mo.App.1973) it is said: "The hearsay rule, however, has no application where the extra-judicial utterance is offered, not as evidence of the truth of the facts asserted therein, but to show the reasons for the witnesses' actions." *Ensign v. Home for the Jewish Aged,* 274 S.W.2d 502 (Mo.App. 1955) involved a case of duress in which the court quoted from *White v. Scarritt,* 341 Mo. 1004, 111 S.W.2d 18, 24 (1937): "It was proper to permit plaintiff and others to testify as to [plaintiff's state of mind] after the filing of the suit and during the negotiations with reference to the same." *Id.* 111 S.W.2d at 507.

The court did not err in admitting this evidence.

Commission contends that the court abused its discretion when it refused to permit it to amend its reply to City's counterclaim so as to include the defenses of estoppel and statute of limitations.

This action was commenced on October 24, 1969. City's counterclaim was filed July 13, 1970 and Commission's reply was filed October 30, 1970. Summary judgment was entered in favor of City and the cause was appealed to the Supreme Court. That judgment was reversed and remanded for trial on May 14, 1974. The court held that there were material factual issues that were unresolved. *State ex rel. State Highway Comm'n v. City of St. Louis,* 509 S.W.2d 126 (Mo.1974). The cause was set and trial was had on June 23, 1975. On May 13, 1975, Commission filed its motion for leave to file an amended reply.[5] As argued by Commission, Rule 55.33 admonishes that "leave [to amend] shall be freely given when justice so requires. . . ." V.A.M.R. 55.33(a). The rule also provides, among other things, that after a responsive pleading has been filed "a party may amend his pleading only by leave of court or by written consent of the adverse party. . . ."

In *Kopff v. Miller,* 501 S.W.2d 532, 535–36 (Mo.App.1973) this court said: "It has been consistently held that while courts should be liberal in permitting amendments to pleadings, whether a particular amendment should be permitted is primarily within the sound judicial discretion of the trial judge whose action will not be disturbed where there is no showing that such discretion has been palpably and obviously abused."

In this case the counterclaim of City had been pending for about four and one-half years. The cause had been pending in the trial court for one year after remand by the Supreme Court. The cause was to be tried in a little over a month from the date that Commission first asked leave to amend. In this case Commission was represented by the same counsel from the beginning of the litigation. The court was not bound by a restrictive local rule in making its determination but did so in the exercise of its discretion. We find no abuse of that discretion in this case. See also *Boling v. State Farm Mutual Automobile Ins. Co.,* 466 S.W.2d 696, 699 (Mo.1971).

Commission complains that the court erred in giving Instruction 8 which reads: "Your verdict must be for defendants upon Counts I, II, III and IV of plaintiff's petition if you do not believe the defendants agreed to pay the right-of-way costs." It is contended that there was no evidence to warrant submission of this instruction.

Instruction 8 is a converse instruction. Commission's verdict directing instructions required the jury to find, as to each of the four counts, that City agreed to pay the percentage of right-of-way costs set out in the contracts. Commission chose to require a finding of this issue by the jury and as said in *McCarty v. Milgram Food Stores, Inc.,* 252 S.W.2d 343, 344 (Mo.1952), "It . . . added nothing to the burden assumed by plaintiff . . . no demonstrable prejudice could result from the giving of [the] instruction . . . ." The court did not err in giving Instruction 8.

Commission urges that the court erred in permitting City to introduce evidence concerning payments made by City to Commission on contracts other than those contracts mentioned in the four counts of Commission's petition because such evidence was beyond the scope of the pleadings.

Paragraph 5 of City's counterclaim is singled out by Commission. It reads:

"5. That defendant City has paid sums of money amounting to $16,973,006.33 in total, to Relator under the mistaken belief that the aforesaid invalid contracts and payments made thereunder together with other payments made for right-of-way costs were required under the Constitution and laws of the State of Missouri as reimbursement to Relator of a portion of the cost of right-of-way acquisitions for highway construction within the confines of City."

We shall also set out paragraph 6 which reads:

"6. That defendant City has paid said sums of money to Relator under duress in

5. Commission states that the proposed amendment was filed April 27, 1975. It gives us no citation to the transcript and a search of the transcript fails to reveal such a filing.

that Relator required said payments to be made as a condition precedent to the construction by Relator of highways within the confines of City."

It was stipulated by the parties that the sums paid by City under contracts sued upon by Commission were $5,022,984.97 as alleged in Commission's petition. It was further stipulated that in addition to the $5,022,984.97, City paid Commission $8,838,-825.03 all of which was for right-of-way costs on projects within the City of St. Louis; that City was required by Commission to make such payments in accordance with Commission's policy; that Commission "required defendant, City of St. Louis, to sign alleged contracts substantially similar to the alleged contracts  . . .  [sued upon by Commission] incorporating the requirement as to right of way costs to be paid by defendant, City of St. Louis, in regard to all of such projects as a condition precedent to the beginning of construction by relator, State Highway Commission of Missouri, on all of such projects."; that all of the contracts were drawn by Commission and no modification of the terms of the contracts so far as the payment for right-of-way costs or the required percentage of payment was allowed by Commission.

Commission did not file a motion for more definite statement or a motion to strike and does not contend that the counterclaim does not state a claim.

It is generally held that when a pleading is first attacked by objection to the introduction of evidence it will be given "a most liberal construction." *Hawkins v. Paeben*, 332 Mo. 479, 58 S.W.2d 437 (1933). There is no doubt that paragraph 5 was not pleaded with the particularity required of good pleading. However, Commission waived the defect by not filing a motion for more definite statement. *Hamilton v. Linn*, 355 Mo. 1178, 200 S.W.2d 69[10] (1947).

It is apparent in this case that Commission was not misled by the pleading as evidenced by the stipulation entered into by the parties in which it is stated that City made payments "other" than those under the contracts sued upon by Commission of over $8,000,000 for right-of-way costs, and that the payments were made under contracts similar to those sued upon by Commission. Paragraph 6 of the counterclaim alleges that the payments were the result of duress. In *Chaffin v. County of Christian*, 359 S.W.2d 730 (Mo. banc 1962) a stipulation of facts was filed. The court denied an attack upon the petition holding that the petition, being consistent with the facts stipulated, would be treated as if amended to embrace the issues made by the facts. We here also treat the counterclaim amended to embrace the facts stipulated. Commission was fully apprised of the issues it was required to face and suffered no prejudice by reason of the defect in City's counterclaim. We find no merit in this issue.

Commission alleges that the trial court erred in permitting City's counsel to engage in closing argument that was "highly prejudicial" and invited the jury to "consider the interests of its members" and "place itself in the role of a participant and advocate in the litigation." Commission contends that City was allowed to argue to the jury that by its verdict it could demonstrate that the citizens of St. Louis would not be pushed around by the citizens of rural Missouri and to tell the jury that the citizens of St. Louis would be the direct beneficiaries of a verdict rendered in favor of the City.

Commission's brief emphasizes the prejudicial impact of the statements and the effect they had on the ability of the jury to render an impartial verdict. The objections made by Commission to the argument were:

"I object, Your Honor, this is outside the record and improper argument."

.      .      .      .      .

" .   .   . I object to this; it is improper argument."

.      .      .      .      .

"Objection, Your Honor, that's totally outside the record and irrelevant."

On this appeal Commission does not contend that the argument was outside the record.

Commission must therefore depend upon its objection of "irrelevant" or "improper argument" to preserve any issue for our consideration. We hold this general objection insufficient to preserve the alleged errors for review. *Gilmore v. Union Construction Co.,* 439 S.W.2d 763, 767 (Mo.1969); *Cassin v. Theodorow,* 504 S.W.2d 203, 205 (Mo.App. 1973).

An objection should be specific in identifying why an argument is improper and in asking the court for an appropriate curative measure. *Larson v. Alton & Southern Railroad,* 431 S.W.2d 687, 692 (Mo. App.1968); *State ex rel. State Highway Commission v. Drisko,* 537 S.W.2d 645, 648 (Mo.App.1976). When a party fails to state a specific ground for an objection he improperly places the burden on the court to determine why an argument is improper and his objection may properly be overruled on that basis alone. When, as here, the court may have based its ruling on any number of grounds an appellate court will usually defer to the trial court's discretion. Only when an argument is so clearly improper or so manifestly prejudicial that the court's ruling constituted a clear abuse of discretion will such a general objection preserve an error for review. *Dodd v. Missouri-Kansas-Texas Railroad,* 353 Mo. 799, 184 S.W.2d 454, 458 (1945); *Critcher v. Rudy Fick, Inc.,* 315 S.W.2d 421, 428 (Mo.1958); *Cassin v. Theodorow,* 504 S.W.2d 203, 205 (Mo.App.1973).

Considering respondent's argument in its entirety, we are unable to conclude that it was infirm under such a standard. In this case respondents claimed that municipalities with populations in excess of 5,000 were required to execute contracts involving large sums of money on the threat that needed roads would not otherwise be built. In this context the remarks were not unduly prejudicial and merely repeated facts the jury was well aware of. Any possible prejudice resulting from the remark that the taxpayers' money was in-

volved was lessened because of counsel's earlier statements to the same effect that had not been objected to. *Carrel v. Wilkerson,* 507 S.W.2d 82, 87 (Mo.App.1974). This point is ruled against Commission.

Commission in two of its points takes issue with City's defense of ultra vires as submitted. This issue is directed solely to City's defense to Count IV of Commission's petition. City pleaded that the contract alleged in Count IV of Commission's petition had been entered into as a result of duress on the part of Commission and that the contract was ultra vires in that it violated Article VI, Section 26(a) of the Missouri Constitution 1945, which reads:

> "No county, city, incorporated town or village, school district or other political corporation or subdivision of the state shall become indebted in an amount exceeding in any year the income and revenue provided for such year plus any unencumbered balances from previous years, except as otherwise provided in this constitution."

City submitted the following instruction based upon the defense of ultra vires:

> "Your verdict must be for defendants upon Count IV of plaintiff's petition if you believe that the defendant City of St. Louis had no unencumbered funds from the fiscal years prior to the fiscal year beginning April 1, 1966, with which to pay the claimed right-of-way costs for Highway I–44 and that other expenditures in the defendant City of St. Louis' budget beginning April 1, 1966, had a priority status over the amount for the claimed right-of-way costs of Highway I–44."

As we read Commission's claims on this issue it contends that there was no substantial evidence that expenditures budgeted by City, other than the obligation of the contract sued upon, exceeded the income and revenue provided for the fiscal year 1966–67.[6] Commission does not claim that there

---

6. The term "year" as used in the constitution has been determined to mean calendar year. *Union Trust & Savings Bank v. City of Sedalia,* 300 Mo. 399, 254 S.W. 28, 31, 32 (1923). We,

however, review the issue here as it is raised by the Commission because the result would be the same.

were unencumbered funds from fiscal years prior to fiscal year 1966–67 available for payments called for under the contract.

Commission relies upon *Webb City & C. Waterworks Co. v. City of Carterville,* 142 Mo. 101, 43 S.W. 625 (1897). In that case the City of Carterville entered into a contract with plaintiff's assignor for rental of hydrants for the supply of water to the City. Suit was filed for monies due under the contract. Carterville interposed the defense of ultra vires. It claimed that the income and revenue of the City for any one year was not sufficient to pay the hydrant rental after paying its current expenses for the maintenance of the City government. The trial court, in ruling that the contract was ultra vires, considered keeping streets in repair, expenses of City elections, publishing City ordinances, boarding of prisoners and supplies for the City jail, cost of preparing tax books, and necessary supplies for City officials as "necessary expenses."

On appeal the court opined that a determination of what should be included in "current and necessary expenses," was pivotal to the question of whether indebtedness exceeded income and revenue provided for any given year. For this determination it turned to Section 4977, Rev.St.1889, the predecessor to Section 513.410 Rev.St.1969, which read:

"Whenever an execution, issued out of any court of record in this state, against any incorporated town or city, shall be returned unsatisfied, in whole or in part, for want of property whereon to levy, such court at the return term or any subsequent term thereof shall, by writ of *mandamus,* order and compel the chief officer, trustees, council and all other proper officers of such city or town, to levy, assess and collect the annual taxes in such town or city from year to year, as occasion may require, within the constitutional limits, and order the same, when collected by the proper officer or officers, to be paid to the execution creditor, his agent or assigns, except such amount as may be necessary to pay the reasonable salary allowed by law to the mayor, council, assessor, marshal, constable, attorney and a reasonable police force of any such town or city. (R.S. 1939, § 1397)"

The court then held 43 S.W. l. c. 629: "It will be seen by this statute that the necessary current expenses of such cities are restricted to the salaries of its officers, and of a reasonable police force, and it would seem that the same rule should apply in an action to recover a judgment under the circumstances disclosed by the record in this case that would apply in proceeding to collect the judgment in the event of one being rendered."

The opinion in *Webb City* is authority for the proposition urged by Commission that expenses of a municipality for the purposes of determining whether there was a violation of Art. VI, Section 26(a) include only the salaries of certain of its officers and of a reasonable police force.

Our search of the record reveals that the evidence on this issue consisted of the ordinance providing for the appropriations for the fiscal year in question which was approved April 27, 1966, the *Annual Report* of the *Comptroller City of St. Louis* for the fiscal year ending March 31, 1967 and the testimony of Mayor Poelker, who was comptroller during that year. The comptroller's report showed that there was a deficit of $447,000 for the fiscal year under consideration.

Mayor Poelker testified that eighty percent of the operating budget was allocated to pay salaries and fringe benefits of employees and that the remaining twenty percent of the budget items had priority over highway acquisition costs.

■ The burden of showing that the indebtedness is void is upon the political subdivision and a mere showing of indebtedness is not sufficient. *Clarence Special School District v. School District No. 67,* 341 Mo. 178, 107 S.W.2d 5 (1937).

Neither party has undertaken an analysis of the exhibits that are material to our

consideration. Our search reveals that, among other items, the comptroller's report lists expenditures for "Election and Registration." Under this category, in addition to provision for salaries, there is an item listed as materials and expenses in the sum of $312,107.73. Other categories showing "material and expenses" are "City Workhouse"—$95,904.08; "St. Louis Chronic Hospital"—$607,082.94; "City Hospital No. 1"—$1,548,829.18; "Maintenance, Municipal Buildings"—$817,665.17; "Street Lighting"—$556,304.64.

We have not undertaken to set out all of the amounts expended upon "materials and expenses" in the numerous departments of the City government. The exhibits also reveal that funds were appropriated and expended for a large number of officers and employees who are not listed in § 513.-410. If all of the expenditures except salaries for the officers enumerated in § 513.410 were excluded the indebtedness of City would not exceed the income and revenues for the fiscal year 1966–67. It is apparent that under the authority of *Webb City* there was insufficient evidence of the defense of ultra vires as submitted by the instruction in this case.

We are constrained to follow *Webb City* as the last controlling decision of the Supreme Court although we have difficulty in comprehending its rationale. The court used § 4977 as its guide for determining whether a municipal obligation was valid. We question this approach because the statute presupposes a valid obligation and is intended to provide the means by which a judgment creditor can collect the debt. It should not be the guide for the determination of ultra vires under Art. VI, Section 26(a). Neither the constitutional provision nor the statute considered by the court in *Webb City* uses the words "necessary expenses."

The purpose of Art. VI, Section 26(a) is "to abolish the credit system and to put counties and other political subdivisions on a cash basis by limiting the legal expenditures of any given year to the income and revenue of that year in the absence of some special authorization." *Missouri Toncan Culvert Co. v. Butler County,* 352 Mo. 1184, 181 S.W.2d 506, 507 (1944). This constitutional provision should be strictly enforced. *Id.*

It would appear that once legally authorized expenditures have been budgeted to the full extent of anticipated income and revenue provided for a fiscal year it is beyond the power of the political subdivision to incur further obligations. To hold otherwise would be to permit cities to incur obligations for materials and supplies to an unlimited amount and defeat the purpose of Article VI, Section 26(a), as discussed in *Missouri Toncan Culvert Company v. Butler County, supra.*

To fulfill the requirement that budget items have priority it would seem reasonable to require that they be expenditures that the political subdivision is authorized by law to make. As indicated by the court in *State ex rel. State Highway Commission v. City of St. Louis,* 509 S.W.2d 126, 127 (Mo.1974) there should not be expenditures which are made to deplete the funds of the political subdivision for the purpose of defeating the claim being made by the creditor. *State ex rel. State Highway Commission v. City of St. Louis, supra,* does not, however, discuss or overrule *Webb City.* As previously stated we must follow *Webb City.*

City urges that the contract violates Art. VI, Section 26(a) in that it requires payments to be made over a period of years. In *Grand River Tp., De Kalb County v. Cooke Sales & Serv.,* 267 S.W.2d 322 (Mo. 1954) the court said l. c. 325:

"[T]he Constitution prohibits any political subdivision of the state from becoming 'indebted in an amount exceeding in any year the income and revenue provided for such year', 26(a), except 'by vote of two-thirds of the qualified electors thereof voting thereon'. 26(b). It has been well established that this means no contract of such a political subdivision is valid which obligates it to make payments in subsequent calendar years."

The position which City now urges was not the theory upon which the case was tried and submitted to the trial court. *Corning Truck & Radiator Service v. J.W.M., Inc.,* 542 S.W.2d 520, 527 (Mo.App. 1976).

We have reviewed the transcript and we cannot say as a matter of law that the contract called for payments to be made over a period of years. Commission's petition alleges that it made billings for sums due under the contract in November 1966, January 1967, February 1968 and April 1969. These allegations were denied by City although City did stipulate that the total sum prayed for in Count IV was $2,227,327.18. We can thus find no admission by Commission that would warrant a finding as a matter of law that there was a violation of Art. VI, Section 26(a) of the Constitution of Missouri.

The court erred in its submission of the issue of ultra vires and that portion of the judgment in favor of City on Count IV of Commission's petition must be reversed and remanded for a new trial.

In conclusion we note that Commission has urged that the duress necessary in this case was that referred to as "Business Compulsion or Economic Duress" which would require that the victim be put at such disadvantage as to destroy the business. This was not the theory of City's defense or counterclaim. What we have heretofore said sufficiently disposes of this issue.

We have reviewed all other matters raised by the parties and find they are without merit and require no further discussion.

For the reasons stated, Count IV of Commission's cause of action is reversed and remanded for a new trial. The judgment in all other respects is affirmed.[7]

REINHARD, J., concurs.

## APPENDIX

McMILLIAN, Judge, dissenting.

I respectfully dissent from that part of the majority opinion affirming the judg-

---

7. A dissent of a judge no longer on the court was received on the date of his resignation. It thus cannot properly be filed as a dissent. However, in fairness to the litigants and the Bar we include his views as an appendix to this opinion with the following comments;

We are in agreement as to the issue which is dispositive of this case. As said by the writer of the appendix,

"In my view the dispositive question is whether the Commission had the authority to adopt a policy requiring cities having a population in excess of five thousand persons to pay a portion of the cost of right-of-way acquisition. If the Commission did not have the authority to adopt this policy, the provisions included in the contracts in compliance with the policy are unenforceable."

He cites *Reilly v. Sugar Creek Township,* 345 Mo. 1248, 139 S.W.2d 525 (1940) as authority for upholding the policy. We had considered but abandoned *Reilly* because it is inapposite. In that case taxpayers were attempting to prevent the township from contributing to payment for right-of-ways under a contract entered into by the township with the Highway Commission. The township was supporting the contract. *Reilly* merely holds, as we hold, that a state subdivision may "contribute" funds to the Commission for the purchase of right-of-ways for state highways "out of funds available for road purposes," as provided by what is now

§ 227.170. This statute is a grant of power and authority to the civil subdivisions of the state as defined in § 226.010. It is not a grant of power to the Highway Commission. In *Reilly* there were funds "available for road purposes" because a bond issue had been passed to pay for the right-of-way. The township did not enter into the contract as the result of a Commission policy that required payment, rather the contract was entered into voluntarily. *Reilly* is not authority for the validity of the policy of the Commission in the case before us.

Neither the Constitution of Missouri nor the statutes specifically empower the Commission to levy upon other subdivisions of the state for the purpose of carrying out its powers. It is urged that the Commission has the power by implication. To so hold, the power to assess could not be confined to acquisition of right-of-ways within the territorial boundaries of the state subdivisions. We would be constrained to hold that the Commission would have the power to levy upon state subdivisions and others for the purpose of carrying out all of its powers including the cost of construction and maintenance of the state highway. Such power would be tantamount to the power to tax. We do not believe that the framers of the Constitution or the legislature intended to repose such power in any bureau of our state government.

ment of the trial court entered upon a jury verdict in favor of the City on its counterclaim for damages under the theory of duress. I concur with the majority opinion insofar as it reverses and remands Count IV of the Commission's petition and the City's ultra vires defense. In my view the dispositive question is whether the Commission had the authority to adopt a policy requiring cities having a population in excess of five thousand persons to pay a portion of the cost of right-of-way acquisition. If the Commission did not have the authority to adopt this policy, the provisions included in the contracts in compliance with the policy are unenforceable.[1] If, however, the Commission did have such authority, the contractual provisions are enforceable. Unlike

the majority, I believe that the Commission did have the authority to adopt such a policy. I also believe there are several technical and policy reasons which make the theory of duress inapplicable to the facts of the present case. For these reasons I am unable to agree with the majority opinion that the Commission's policy requiring the City pay part of the cost of right-of-way acquisition was invalid or that "[u]nder the facts of this case duress was available to City as a defense or presented a viable basis for its counterclaim."

Whether the Commission unlawfully exceeded its powers in establishing the policy requiring the City to pay part of the cost of right-of-way acquisition is a question of delegation of power.[2] As the majority opinion

---

1. See People ex rel. Rodgers v. Coler, 166 N.Y. 1, 59 N.E. 716 (1901); City of Cleveland v. Clements Bros. Constr. Co., 67 Ohio St. 197, 65 N.E. 885 (1902). In Clements Bros. a construction company had contracted with the City for the construction of a sewer. The City refused to pay part of the contract price because the construction company allegedly breached part of the contract, a stipulation based upon a state statute limiting the daily work hours of persons employed on public works projects. The construction company challenged the constitutionality of the statute. The Court noted that

"[i]f the law is valid, it governs the contract and the rights of the parties, whether actually incorporated into writing or not, since all contracts are assumed to be made with a view to existing laws on the subject. If it is not valid, the contractor has not made it so by stipulating in writing to obey it . . . ."

65 N.E. at 891, citing People ex rel. Rodgers v. Coler, 59 N.E. at 718. The court found the statute was unconstitutional and held the stipulation, even though incorporated in the contract, was not enforceable because the enforceability of the stipulation depended upon the validity of the statute requiring its inclusion in the contract. 65 N.E. at 891. Thus, the fact that the parties incorporated a provision required by statute into their contract did not obligate the parties because the statute was invalid. The court in Clements Bros. noted, quoting further from People ex rel. Rodgers v. Coler, "It is not in the power of the legislature to protect an invalid law from judicial scrutiny by providing that it must receive the assent of the parties to every contract to which it relates." 59 N.E. at 718.

In the present case the incorporation of the Commission's policy into the contracts themselves cannot protect the challenged provisions if the Commission's policy is for some reason

invalid. If the policy is invalid, the affected provisions are unenforceable. For example, the Commission could not enforce a contract which it had no power to make. See State ex rel. State Highway Comm'n v. Kansas City Power & Light Co., 232 Mo.App. 308, 105 S.W.2d 1085 (1937).

2. The nondelegation doctrine was originally intended to prevent improper delegation of legislative power to non-legislative bodies by requiring that every delegation of power be accompanied by meaningful statutory standards. The objectives of this doctrine have never been achieved because the delegation of legislative power, with or without meaningful statutory standards, has become a necessity at all levels of government. See K. Davis, Administrative Law—1970 Supp. §§ 2.00—1, 3 pp. 41–46 (1971).

"[A] modern regulatory agency would probably be an impossibility if power could not be delegated with vague standards. Typically, a regulatory agency must decide many major questions that could not have been anticipated at the time of the statutory enactment; typically, legislators are unable to write meaningful standards that will be helpful in answering such major questions; and typically, the protections lie much less in standards than in frameworks of procedural safeguards plus executive, legislative or judicial checks."

Id. at 46; see also Freedman, Book Review, 43 U.Chi.L.Rev. 307, 318 (1976) (S. A. Barber, The Constitution and the Delegation of Congressional Power).

Moreover, "[t]he contemporary approach [in judicial review of administrative action] is one of not invalidating even the broadest statutory delegations of power, but of assuring that they are accompanied by adequate controls on sub-

observes (citing *State ex rel. St. Louis County v. State Highway Comm'n.,* 315 Mo. 707, 286 S.W. 1, 2 (banc 1926), the Commission is vested "only with such powers as are specifically conferred upon it by the Constitution and statutes, as well as those implied powers which are necessary or proper to enable it to carry out fully and effectively the purposes of the act." The majority found no express or implied authority in our constitution or statutes which empowered the Commission to charge the City for part of the right-of-way costs. *See* Mo.Const. Art. IV, §§ 29, 30(b), 31 (1945); §§ 227.170, 227.180 RSMo 1969. I disagree.

In my opinion the majority opinion has interpreted the implied powers of the Commission too narrowly. The Commission is a subordinate branch of the executive department of the state, *e. g., Bush v. State Highway Comm'n.,* 329 Mo. 843, 46 S.W.2d 854 (1932), and the political subdivision of the state with the dominant, primary and superior dominion over highways. *E. g., Jackson County Public Water Supply Dist. No. 2 v. State Highway Comm'n.,* 244 S.W.2d 4 (Mo.1952). The Commission has authority which is legislative in nature, directly from the state constitution, to locate, relocate, design and maintain all state highways and to construct and reconstruct state highways, subject to limitations and conditions imposed by law as to the manner and means of exercising that authority.[3] In

sequent administrative behavior." Leventhal, Principled Fairness and Regulatory Urgency, 25 Case W.Res.L.Rev. 66, 70 (1974); *see Barry & Barry, Inc. v. State Dep't of Motor Vehicles,* 81 Wash.2d 155, 500 P.2d 540 (1972) (court noted that the needs and demands of modern government require the delegation of legislative power without specific guiding standards).

**3.** Sec. 536.150 RSMo 1969 provides for judicial review of any administrative decision determining the legal rights of any person which is not subject to administrative review. The court may hear evidence on the question and determine whether the decision is unconstitutional, unlawful, unreasonable, arbitrary, capricious or involves an abuse of discretion. The court may not, however, substitute its discretion for discretion legally vested in an administrative agency. *See Joseph L. Pohl, Contractor v. State Highway Comm'n,* 431 S.W.2d 99 (Mo. banc 1968).

The litigation between the Commission and several water districts and water companies illustrates the limited scope of administrative and judicial review of Commission policy decisions. For example, in *State ex rel. State Highway Comm'n v. Weinstein,* 322 S.W.2d 778 (Mo. banc 1959), the Commission brought an original proceeding in prohibition to prevent the circuit court from reviewing an order of the Commission directing relocation of water company mains on state-owned highway rights-of-way at water company expense. Our supreme court held the administrative procedure act, § 536.010 *et seq.,* was applicable by drawing an analogy between the Commission's order to relocate and licensing. 322 S.W.2d at 783. The court specified that the question at the required administrative hearing was whether reconstruction of the highway made relocation of the water lines to avoid interfering with the new highway and that judicial review was limited to a determination whether on all the evidence produced at the administrative hearing the agency could reasonably have made findings which would show relocation of the water lines was necessary. *Id.* at 787; *see also St. Louis County Water Co. v. State Highway Comm'n,* 386 S.W.2d 119, 123 (Mo.1964). The court continued and distinguished those cases involving matters subject to administrative and judicial review from those involving "general legislative and policy matters, committed entirely to the discretion and judgment" of the Commission and thus not subject to the administrative procedure act or judicial review. 322 S.W.2d at 787, *citing State ex rel. Kansas City v. State Highway Comm'n,* 349 Mo. 865, 163 S.W.2d 948 (banc 1942) (determination of amount and time of state refund to City for bridge taken over by Commission); *State ex rel. State Highway Comm'n v. Sevier,* 339 Mo. 479, 97 S.W.2d 427 (1936) (authority to build interstate bridges); *Selecman v. Matthews,* 321 Mo. 1047, 15 S.W.2d 788 (1929) (authority to locate highways); *Castilo v. State Highway Comm'n,* 312 Mo. 244, 279 S.W. 673 (1925) (authority to locate highways).

Similarly, in *Jackson County Public Water Supply Dist. No. 1 v. State Highway Comm'n,* 365 S.W.2d 553 (Mo.1963), the court indicated that matters of policy are committed solely to the discretion of the Commission and as such are not subject to the administrative procedure act. The water supply district had filed a petition under the administrative procedure act for review of the Commission's order directing relocation of water lines at the district's expense. The court held that the Commission's determination of which party should pay for relocation of water or utility lines necessitated by highway construction involved a policy matter and was not a quasi-judicial decision within the meaning of Art. 5, § 22. *Id.* at 559. Thus, if the agency action is constitutional and involves policy matters, judicial review is restricted to

performing these tasks the Commission exercises legislative discretion and finds necessary legislative facts by its own methods, which are not subject to judicial review or control because the location and design of highways are matters of policy committed solely to the discretion of the Commission. *See State ex rel. State Highway Comm'n v. Weinstein,* 322 S.W.2d 778, 783–84 (Mo. banc 1959).

Given such a broad delegation of power to the Commission to design, locate, construct and maintain an adequate system of connected state highways, *see* Mo.Const. Art. IV, § 30(b) (1945), I can only conclude that the Commission was acting within the scope of its authority in establishing the policy at issue. The Commission evidently found the necessary legislative facts by its own methods and, exercising its legislative discretion, adopted a policy requiring towns and cities above a certain population size to pay part or all of the costs of the necessary right-of-way. As noted above, this type of policy-making is committed solely to the discretion of the Commission, particularly in the absence of any showing that the policy was in itself arbitrary, capricious, unreasonable, an abuse of discretion or applied unequally.[4]

In addition, I am persuaded that the Commission's policy was within its authority by the analysis of a similar question in *Reilly v. Sugar Creek Township,* 345 Mo. 1248, 139 S.W.2d 525 (1940). In *Reilly* resident taxpayers of the township filed an action to enjoin payment of several condemnation awards. The county in which the township was located had entered into an agreement with the state highway department for the construction of a supplementary state highway through the township. Pursuant to the agreement, the county was to secure or cause to be secured the necessary right-of-way. The township voted to issue bonds for the purpose of constructing the supplementary highway. The taxpayers brought the action to prevent payment of the condemnation awards from the proceeds of the bond issue.

The specific question before the court was whether the township's bonds and the proceeds therefrom could be used to pay condemnation awards for the necessary rights-of-way for the supplementary state highway. The court held that the grant of authority to the township to issue bonds for the purpose of raising funds to pay for the construction of roads necessarily carried with it the authority to pay for the rights-of-way upon which to build the roads, for otherwise the authority to build roads in itself would be a useless power. *Id.* 139 S.W.2d at 526.

In response to the taxpayers' contention that even if the township had the authority to purchase land upon which to construct a township road, the township did not have authority to pay for land condemned by the state highway department for the purpose of building a state highway, the court observed that the state highway legislation, *see* 1921 Mo.Laws 131 (now § 226.010 et seq. RSMo 1969), "in no way curtailed the right of a township to raise funds for the purpose of constructing roads within the township."

essentially whether the agency abused its discretion in deciding as it did. Most decisions about highway construction are necessarily left to the expertise and discretion of agency officials charged with the responsibility, the Commission and state highway department. *Cf. State ex rel. State Highway Comm'n v. Riss,* 432 S.W.2d 193 (Mo.1968) (highway location); *State ex rel. State Highway Comm'n v. Public Serv. Comm'n,* 459 S.W.2d 736 (Mo.App.1970) (location within sound discretion of state highway department; such discretion will not be interfered with so arbitrary and unreasonable as to justify intervention); *see also State ex rel. State Highway Comm'n v. Curtis,* 359 Mo. 402, 222 S.W.2d 64 (1949).

4. For example, in *State ex rel. State Highway Comm'n v. Curtis,* 359 Mo. 402, 222 S.W.2d 64, 69 (banc 1949), the court noted that the power to locate a highway and to determine its width, type of construction and extent of land necessary for economical and proper construction are vested in the sound discretion of the Commission which is uncontrolled by courts except to compel strict compliance with the statutes and to prevent the taking of private property for a private or non-public use, absent an allegation and proof of fraud, bad faith or an arbitrary and unwarranted abuse of discretion. *See also City of St. Louis v. Senter Commission Co.,* 336 Mo. 1209, 84 S.W.2d 133 (1935).

*Reilly v. Sugar Creek Twp., supra,* 139 S.W.2d at 527. Further, neither the state constitutional amendment expressly authorizing the construction of supplementary state highways, *see* Mo.Const. Art. IV, § 44a (1875) (*see* Mo.Const. Art. IV, § 32 (1945) for current supplementary highway authorization), nor the state highway laws restricted the authority of the state subdivisions to raise funds for road purposes. *Id.* In fact, the court noted that § 8131 RSMo 1929 (*see* § 227.170 RSMo 1969)[5] expressly authorized local subdivisions to pay for rights-of-way, even though the rights-of-way were for state highways. *Id.* The proposed road in *Reilly* was a "farm-to-market road" and as such built primarily for local use, although the state highway department supervised the construction and the road was called a "state highway." *Id.* The court continued its analysis of the scope of the statute, observing that the laws creating the state highway system, especially § 8131, revealed a legislative intent that local subdivisions aid in constructing these highways by furnishing and paying for the rights-of-way. *Id.* 139 S.W.2d at 528.

In *Reilly* the state highway department agreed to construct the supplementary state highway on condition that the local authorities furnish the necessary rights-of-way.[6] As the court in *Reilly* pointed out, the local communities received the benefit of state aid in construction of a road which would be part of the state highway system and maintained by the state. Without state aid, the local communities would have had to bear the entire cost of construction and maintenance, in addition to paying for the necessary rights-of-way. *Id.* Similarly, the state highway department (the Commission) in the contracts at issue in the present case agreed to construct and maintain the highways described as part of the state highway system on condition that the City pay, in accordance with the Commission's policy, part of the costs of acquiring the necessary rights-of-way. The City agreed to pay the non-federal or state share of federal-state funding ratio of the acquisition costs for rights-of-way for that portion of federal-aid highway construction projects within the City limits. The contracts alleged in Counts I and III called for payment of 50% of the acquisition costs and 10% of such costs in Counts II and IV.[7] As in *Reilly*, without these contracts the City would have had the entire burden of construction and maintenance of the highways as local roads.[8] Instead the City received

5. Sec. 227.170 RSMo 1969:

"Any civil subdivision as defined in section 226.010, RSMo 1949, shall have the power, right and authority, through its proper officers, to contribute out of funds available for road purposes all or a part of the funds necessary for the purchase of right of ways for state highways, and convey such right of ways or any other land, to the state of Missouri to be placed under the supervision, management and control of the state highway commission for the construction and maintenance thereupon of state highways and bridges. Funds may be raised for the purpose of this section in such manner and such amounts as may be provided by law for other road purposes in such civil subdivision; provided, that there shall not at any time be any refund of any kind or amount to said civil subdivision by the state of Missouri for lands, acquired under this section."

6. *See State ex rel. St. Louis County v. State Highway Comm'n,* 337 Mo. 878, 86 S.W.2d 1066 (banc 1935); *State ex rel. State Highway Comm'n v. City of Washington,* 533 S.W.2d 555 (Mo.1976).

7. The federal-state funding ratio for primary highways was 50–50; it has been changed to 70–30. The federal-state funding ratio for interstate and urban highways is 90–10.

8. Theoretically the City could have built the highways itself. Even with federal aid, however, the cost would in all likelihood have been prohibitive. In addition, it is doubtful whether the City would have been eligible to apply independently for federal aid. The federal statutes speak exclusively of *state* responsibility and authority. *See* 23 U.S.C.A. § 302(a) (Supp. 1978); 23 CFR 1.3–.4 (1977); *see also* §§ 226.-150, 226.220 RSMo 1969 & Supp.1977. *See generally* Mashaw, *The Legal Structure of Frustration: Alternative Strategies for Public Choice Concerning Federally Aided Highway Construction,* 122 U.Pa.L.Rev. 1, 8 (1973) [hereinafter cited as *Alternative Strategies* ]; Schwartz, *Urban Freeways and the Interstate System,* 49 S.Cal.L.Rev. 406, 406–40 (1976) [hereinafter cited as *Urban Freeways* ].

Professor Mashaw has characterized the entire program of federal aid for highway construction as an enormous grant-in-aid program,

the benefit of substantial highway construction and maintenance at state expense in exchange for paying for a percentage of the right-of-way cost.[9]

I am unable to find any reason to depart from the analysis in *Reilly* for the reason that the highway construction in the present case was largely funded by a third party, the federal government. Examination of federal highway laws and regulations has revealed nothing to support the City's position. In fact, federal highway legislation emphasizes the state's primary responsibility and authority for highway construction [10] and has served to reinforce the power of state legislatures and state highway departments [11] while restricting the federal role to funding, certain procedural requirements, and specification of design and engineering standards.[12] The Commission retained its policy of offering state road construction and maintenance in exchange for acquisition by the local community of the necessary rights-of-way. The policy was modified as significant amounts of federal aid became available to the states for highway construction [13] to require that the local community pay only for the non-federal or state share of the cost of acquiring the necessary rights-of-way.

In sum, I conclude that, under our state constitution, statutes and case law, the Commission had the authority to establish this policy. Like many other controversial policy decisions that involve the planning and construction of highways, the adoption of this particular policy was within the discretion of the Commission. The wisdom of establishing the policy and in applying it to the contracts with the City are not at issue in this case.

I am unable to agree with the majority opinion's duress analysis for several reasons which, in my opinion, make the theory of duress inapplicable to the facts in the present case. First, the majority opinion isolates the key factor in a case of duress under Missouri case law as the state of mind of the coerced party.

> "The question is: Was the person so acted upon by threats by the person claiming the benefit of the contract, for the purpose of obtaining the contract, . . . and was the contract thereby obtained. . . . The ultimate fact in issue is whether the alleged injured party was bereft of the free exercise of his will power . . . ."

*Coleman v. Crescent Insulated Wire & Cable Co.*, 350 Mo. 781, 168 S.W.2d 1060, 1066 (1943). The free will test [14] is, however, of

administered jointly by the Federal Highway Administration (FHWA) and the state highway departments. *Alternative Strategies, supra,* at 16.

9. The cost of land acquisition in urban areas is astronomical compared with land acquisition in rural areas. *See Urban Freeways, supra,* at 487 & n.498, 488 & n.499. "Land acquisition was known *in 1956* to be often 50% and sometimes as high as 80% of the total freeway cost." *Id.* (emphasis added). Some factors that contribute to the greater cost of urban land acquisition are the need for more lanes and consequently more land to handle the higher volume of traffic in urban areas, the need for more entrance-exit interchanges in urban areas, the higher fair market value of land in urban areas, and the development of more specialized interests and methods of valuation in condemnation law.

10. *See* 23 U.S.C.A. § 302(a) (Supp.1978).

11. State highway departments are notoriously antiurban in orientation. *See* Mashaw, *Alter-*

native Strategies, supra, at 18–19; Schwartz, *Urban Freeways, supra,* at 416 & n.54.

12. For example, at various points in the process of FHWA approval of highway projects, the state highway department must consider local needs and planning, conduct location and design hearings, and so certify to the FHWA.

13. *See* Federal-Aid Highway Act of 1956, Act of June 29, 1956, ch. 462, 70 Stat. 374.

14. Emphasis upon the free will or unfettered will of the coerced party is derived from the nineteenth century's subjective free will theory of contracts in which contractual liability depends upon the freely willed consent of the parties to the contract. *E. g., Coleman v. Crescent Insulated Wire & Cable Co., supra,* 168 S.W.2d at 1066; *see generally* Pound, The Role of the Will in Law, 68 Harv.L.Rev. 1 (1954); Williston, Freedom of Contract, 6 Cornell L.Q. 365 (1921); *but see* Hale, Coercion and Distribution in a Supposedly Non-Coercive State, 38 Poli. Sci. Q. 470 (1923). The state of mind of

little analytical value because it fails to recognize that "both normal contracts and those formed under duress result from a choice between alternative evils . . . [and that] it is impossible to distinguish one situation from the other on the basis of any difference in the freedom of contract." Note, Economic Duress After the Demise of Free Will Theory: A Proposed Tort Analysis, 53 Iowa L.Rev. 892, 894 & n.16 (1968) [hereinafter cited as Note]. Thus, I think the conclusion of the majority that the City did not act voluntarily in executing the contracts is insufficient to support the finding of duress.[15]

Second, in my opinion economic duress has evolved in Missouri case law not as a distinct theory but as merely one aspect of duress. *E. g., Furman v. Gulf Ins. Co.*, 152 F.2d 891, 891–892 (8th Cir. 1946); *White v. McCoy Land Co.*, 229 Mo.App. 1019, 87 S.W.2d 672, 684–685 (1935), *aff'd sub nom., White v. Scarritt*, 341 Mo. 1004, 111 S.W.2d 18 (1937). The coercing party typically threatens to "expose the other party or his near relative by blood or marriage to deep disgrace or himself to serious financial loss or injury to his business or property under distressing circumstances, which an ordinary suit at law or equity might be inadequate to remedy." *Mississippi Valley Trust Co. v. Begley*, 298 Mo. 684, 252 S.W. 76, 78–79 (banc 1923) (threat of criminal prosecution of oppressed party's son and son-in-

law for forgery); *see also Weisert v. Bramman, supra*, 216 S.W.2d 430 (threatened civil action challenging the mental capacity of oppressed party's husband); *Coleman v. Crescent Insulated Wire & Cable Co., supra*, 168 S.W.2d 1060 (threatened criminal prosecution); *White v. McCoy Land Co., supra*, 87 S.W.2d 672 (threatened taxpayer's injunction action to contest bond issue for construction of courthouse; suit would have had severe financial effect on coerced party); *cf. Leeper v. Beltrami*, 53 Cal.2d 195, 1 Cal.Rptr. 12, 347 P.2d 12 (1959) (coercing party knowingly pressed false claim against realty, forcing owner who needed money to sell at one-third value). In the present case the Commission "threatened" the City by refusing to construct certain federal-aid highway projects within the City limits unless the City paid the non-federal share of the costs of acquiring the necessary rights-of-way. This threat is essentially economic, that is, the loss of highway construction and the loss of transportation and traffic control the highways represent.

My principal objection to the use of the duress doctrine, and more precisely economic duress, is that the facts of the present case simply are not those which constitute an appropriate basis for such analysis. These facts do not constitute a bargaining situation in which a standard of commercial reasonableness can be applied.[16] Even ac-

the coerced party, that is whether the coerced party's free will has been overcome, is critical; " 'the means used to produce such state of mind, the age, sex, capacity, situation, and relation of the parties, are all evidentiary.' " *Weisert v. Bramman*, 358 Mo. 636, 216 S.W.2d 430, 434 (1948).

15. A finding of duress often represents what is essentially a *"moral judgment on the fairness of the alternatives* presented by the threatening party." Note, 53 Iowa L.Rev. at 894 & n.16. In my view there is little room for moral judgment as such in a duress analysis. More useful would be concentration upon whether the coercing party acted reasonably, or, in a case of economic duress, whether the contractual demands in the particular bargaining situation were commercially reasonable. A standard of reasonableness is of course similarly unprecise and subject to varying interpretation; it is, however, not as subjective and personal as a

determination as fairness and is a standard which the law frequently employs in other areas. In the present case there is no room for moral judgment or commercial reasonableness. Instead the question is one of intergovernmental relations, wherein vague standards of morality, fairness and commercial reasonableness do not apply, and which must be resolved under our state constitution and statutes.

16. "The duress doctrine is intended to prevent a stronger party from presenting an unreasonable choice of alternatives to a weaker party in a *bargain situation*. The *duty* [in an analysis of duress as a tort] which arises, therefore, is an obligation to exercise superior bargaining power reasonably. [There is a *breach of this duty*] if the stronger party threatens an action which cannot be justified, under a *standard of commercial reasonableness*, by the weaker party's refusal to meet the contractual demand. *Cause in fact* de-

cepting for the moment that the contracts in question can appropriately be analyzed in a commercial context and that the parties must then be held to a standard of commercially reasonable conduct, the Commission's demands were not unreasonable. The Commission is given by our state constitution and statutes and federal highway statutes a "superior bargaining position" in the hierarchy of state government when compared with the City. As discussed above, the Commission acted within its authority in establishing the right-of-way policy and thus was able to legitimately present the City with a choice between two costly alternatives, paying the state share of right-of-way acquisition costs or foregoing state construction of federal-aid highway projects.[17] In fact, it is arguable that the pressure of external circumstances,[18] that is, the lack of financial resources, rather than any coercion by the Commission, "threatened" the City.

In addition there are several defenses to the doctrine of duress which, in my opinion, are applicable to the facts in the present

pends on a showing that the victim would not have acquiesced in the contract if the wrongful threats had not been issued. *Damages* should be computed on the basis of the injury to the weaker party, and he should be able to recover to the full extent of his loss."
Note, 53 Iowa L.Rev. at 924 (emphasis added); *see also* Dalzell, Duress by Economic Pressure I, 20 N.C.L.Rev. 237 (1942); Dawson, Economic Duress—An Essay in Perspective, 45 Mich.L. Rev. 253 (1947). *See generally* 13 Williston on Contracts § 1617, p. 704 (W. H. Jaeger 3d ed. 1970). Williston defines the elements of economic duress more generally than the author of the note in the Iowa Law Review cited above: (1) the coerced party must show he has been the victim of a wrongful or unlawful act or threat, (2) such act or threat must be one which deprives the victim of his unfettered will, (3) as a direct result the coerced party must be compelled to make a disproportionate exchange of values or give up something for nothing, (4) the payment or exchange must be made solely for the purpose of protecting the coerced party's business or property interests, and (5) the coerced party must have no adequate legal remedy. 13 Williston on Contracts, *supra*, § 1617.

The facts in the present case do not constitute a typical commercial situation. In the words of the majority opinion, highways are not a commodity to be sold by the Commission to the City in the usual commercial sense. The components of highway construction are of course capable of being bought and sold. The planning and actual construction, although physically performed by commercial construction companies as the case may be, of highways is an exclusively governmental function. The state highway system, however, does not include highways within the city limits of the City by the statutory description. *See* § 227.- 020 RSMo 1969; *Moulder v. Webb*, 527 S.W.2d 417 (Mo.App.1975); *cf. State ex rel. Russell v. State Highway Comm'n*, 328 Mo. 942, 42 S.W.2d 196 (banc 1931) (federal highway within the corporate limits of Kansas City held not a part of the state system of primary and secondary highways). Under the contracts in question the highways have apparently been incorporated into the state highway system; a "state highway" is defined as a highway constructed or maintained at the cost of the state, or constructed with the aid of state funds or the United States government funds, or any highway included by authority of law in the state highway system. § 226.010(7) RSMo 1969.

17. *But see* §§ 226.150, 226.220 RSMo 1969 & Supp.1977 (authorizing the Commission to pay the non-federal or state proportion of the cost of federal-aid highway construction out of the state road fund).

18. "If no one else can supply a certain product or service because of scarcity and the party with a supply of the product or service charges an outrageously high price, the courts generally uphold the transaction at that price. They reason that the overwhelming pressure derives from *external circumstances* and not from any wrongful threat of the stronger party. The only threat the stronger party makes in this situation is the *implicit* threat not to supply the product or service, and this is not wrongful because the refusal to pay the purchase price provides a justifiable reason for refusing to supply the product or service. The motive for retaining the goods or services after the refusal to pay the purchase price would be the desire to protect oneself from economic disaster accompanying the free distribution of the goods or services."
Note, 53 Iowa L.Rev. at 911 (emphasis added and footnotes omitted). The author, however, cautions against the extension of this doctrine to cases where the threat by the stronger party is arguably wrongful but the cause of the unequal bargaining positions was the external circumstances. *Id.* n.101.

case. For example, was the Commission's threat to withhold state construction of fed-

eral-aid highway projects in itself wrongful?[19]  Did the City have full knowledge of

**19.** Case law frequently states that "[t]he character of the threats [in a case of duress] is not so material, it being sufficient to constitute legal duress, if they deprive the party purporting to be obligated of his free moral agency." E. g., *Coleman v. Crescent Insulated Wire & Cable Co., supra,* 168 S.W.2d at 1066. In *Ensign v. Home for the Jewish Aged,* 274 S.W.2d 502, 507 (Mo.App.1955), while not an economic duress case, the court, relying on *Coleman* and *Weisert v. Bramman,* understood the rule to mean the threats need not be illegal or wrongful. *See also Steinger v. Smith,* 358 Mo. 39, 213 S.W.2d 396, 400 (1948). *Ensign* is almost certainly erroneous to the extent that it implies that the threats in a case of duress do not have to be in some sense *wrongful.* More correctly, the threats do not have to be *independently* illegal, tortious, criminal or a breach of contractual duty; rather, "[t]he wrongfulness of the coercer's conduct [derives] from the fact that the threatened party was forced to accept a contract, not from any inherent wrongfulness of the act threatened." Note, 53 Iowa L.Rev. at 898; *see generally* 13 Williston on Contracts, *supra,* § 1608; Restatement of Contracts § 492 (1932); Dalzell, Duress by Economic Pressure I, *supra,* at 240; 25 Am.Jur.2d Duress and Undue Influence §§ 11–14 (1966).

In the present case the Commission, which ordinarily does not have any road or highway responsibility within the City, has proposed to assume the responsibility for construction and maintenance of the proposed federal-aid highways which pass through the City. The Commission, however, conditioned its acceptance of responsibility upon payment by the City of the non-federal, or state, share of the costs of acquiring the necessary rights-of-way. The policy of conditioning state construction and maintenance of particular roads or highways upon the locality's furnishing the necessary right-of-way was not in itself wrongful nor, in my opinion, did the Commission in making this policy part of any agreement made with the City threaten and thereby force the City into accepting the contracts. In my opinion, the current status of the Commission and the City with regard to the funding arrangements specified by the federal-aid highway statutes is what really "threatened" the City; the arrangements in the present case are substantially similar to that in *Reilly,* with the additional factor of federal aid. This, however, does not change the basic underlying relationship between the City and the Commission. Even the provision of massive federal aid has not changed the fundamentally state-oriented character of highway planning and construction. *See* 23 U.S. C.A. § 145 (Supp.1978) (Federal-Aid Highway Act of 1973, § 123(a), Pub.L.No. 93–87, 87 Stat. 261–62) (provisions of this chapter provide for a federally assisted state program). This section was added after litigation raised questions

about the nature of the federal-state relationship in the federal-aid highway program. In *Named Individual Members of the San Antonio Conservation Soc'y v. Texas Highway Dept.,* 446 F.2d 1013 (5th Cir. 1971), *cert. denied,* 406 U.S. 933, 92 S.Ct. 1775, 32 L.Ed.2d 136 (1972), the plaintiffs sought to enjoin federal funding of two unconnected highway segments known as the North Expressway Project in San Antonio. These two segments abutted the north and south ends of Breckenridge Park. The highway department proposed to construct the connecting highway segment through the park using *state* highway funds and thus avoid compliance with federal regulations, such as NEPA. *See, e. g., Citizens to Preserve Overton Park v. Volpe,* 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971). The Texas highway department was eventually successful; the termination of federal funding for the connecting segment was held to have the legal effect of exempting the segment from federal environmental regulations. *Named Individual Members of the San Antonio Conservation Soc'y v. Texas Highway Dept.,* 496 F.2d 1017 (5th Cir. 1974), *cert. denied,* 420 U.S. 926, 95 S.Ct. 1123, 43 L.Ed.2d 396 (1975). Although this result was discouraging to the highway opposition, it was nonetheless consistent with the basic structure of the federal-aid highway program. A contrary result would have substantially altered the fundamental grant-in-aid character of the highway aid program.

> "[I]f the state highway department's general power to allocate federal aid funds among various highway projects is relied on by courts to justify the application of federal grant conditions to road building activities which are wholly state financed, the courts will have gone some distance toward "federalizing" all the activities of state highway departments which are carried out on routes which are within the general classifications eligible for federal funding."

Mashaw, *Alternative Strategies, supra* at 37.

In sum, I am persuaded that the Commission has the authority to establish this policy under those implied powers necessary to fully and effectively design and construct state highways. If this construction of our constitution and statutes is in its effect broader than the drafters intended, the remedy is to restrict the discretion of the Commission with respect to the formation of policy by constitutional amendment or appropriate legislation. Legislation could also relieve the City of some of the financial burden of highway construction. *See* N.Y.High.Laws §§ 340–b, subd. 4, 5; 349–c (McKinney & Supp.1977) (providing for state reimbursement of city for any costs and expenses of property acquisition for highway purposes); *see also City of New York v. State,* 61 Misc.2d 517, 306 N.Y.S.2d 131 (Ct.Cl.1969),

the facts and ample time for deliberation?[20] Did the City ratify the contracts by reason of an undue delay in asserting the claim of duress and thus in repudiating the contracts?[21] Moreover, two theories related to duress, duress by a public utility[22] and un-

20. *aff'd*, 49 A.D.2d 644, 373 N.Y.S.2d 853 (1975), *modified on other grounds*, 40 N.Y.2d 659, 389 N.Y.S.2d 332, 357 N.E.2d 988 (1976); *City of New York v. State*, 49 A.D.2d 641, 370 N.Y. S.2d 241 (1975).

20. "[I]t is also the general rule that a claim of duress cannot be sustained where there is full knowledge of the facts of the situation and ample time and opportunity for full and free investigation, deliberation and reflection." *Weisert v. Bramman, supra*, 216 S.W.2d at 434, citing *Tanner v. West*, 339 Mo. 738, 99 S.W.2d 7, 16 (1936); *Ensign v. Home for the Jewish Aged, supra*, 274 S.W.2d at 508. Although it is unclear from the record precisely how long the Commission and the City quarreled about the contracts prior to execution, a reasonable minimum estimate is several months. During this period there was considerable discussion among city officials, the Board of Alderman, and the City Counselor. These circumstances seem to indicate that the City had full knowledge of the facts as well as an opportunity for deliberation, investigation and reflection, thus raising the possibility that any claim of duress had been nullified. *See Weisert v. Bramman, supra*, 216 S.W.2d at 434 (negotiation period of several months, consultation with lawyer); *Tanner v. West, supra*, 339 Mo. at 752, 99 S.W.2d at 16; *Ensign v. Home for the Jewish Aged, supra*, 274 S.W.2d at 508.

21. A contract executed under duress is voidable, not void; therefore, if a coerced party intends to assert duress and repudiate the contract, he must do so with reasonable diligence after the duress is removed. Undue delay may constitute ratification of the contract. For example, in *Weisert v. Bramman, supra*, 216 S.W.2d at 435, the court found that the duress, a threat to challenge the mental capacity of the plaintiff's husband, ended with his death and held her claim of duress which was not raised until five years later was barred by ratification. *See, e. g., Farmers' State Bank v. Day*, 226 S.W. 595 (Mo.App.1920); *see also Gallon v. Lloyd-Thomas Co.*, 264 F.2d 821, 826 (8th Cir. 1959); *Yingling Aircraft Inc. v. Budde*, 208 F.Supp. 773, 776 (D.Colo.1962). There is, however, no question of ratification if the duress was continuous, *see White v. Scarritt*, 341 Mo. 1004, 111 S.W.2d 18, 24 (1937) (duress found to have continued until money was paid or the contract performed); or if the coerced party did not have full knowledge of the facts, *see Mathis v. Crane*, 360 Mo. 631, 230 S.W.2d 707 (1950); or if the coerced party in some way protested or refused to accept any benefits under the contract, *see Weisert v. Bramman, supra*, 216 S.W.2d at 435.

The four contracts at issue were executed between 1959 and 1966. At some point, after paying only part of the amount due under three of the four contracts, the City stopped making payments. In October, 1969, the Commission sued the City for breach of contract; the City answered and counterclaimed for recovery of its previous payments in July, 1970. I cannot find that this sequence of events represents the necessary "reasonable diligence" to preclude ratification, especially when the City did not initiate any legal action to repudiate the contracts but only reacted defensively. *See Farmers' State Bank v. Day, supra*, 226 S.W. at 595; *Deibel v. Jefferson Bank*, 200 Mo.App. 541, 207 S.W. 869 (1919); *see also* Annot., 77 A.L.R.2d 426 (1961). In addition, the City's silence, *see Weisert v. Bramman, supra*, 216 S.W.2d at 434, and making of payments according to the terms of the coerced contracts, *see Bushnell v. Loomis*, 234 Mo. 371, 137 S.W. 257, 289 (1911), are factors indicative of ratification. Further, because the Commission adopted the policy on right-of-way acquisition some time before 1950, the City was well aware of its existence and had ample time and opportunity to evaluate its probable impact and consider possible legal challenges. *Cf. State ex rel. State Highway Comm'n v. Weinstein, supra*, 322 S.W.2d at 779 (administrative review); *but see Jackson County Public Water Supply Dist. No. 1 v. State Highway Comm'n*, 365 S.W.2d 553 (Mo.1963) (no judicial review of highway commission policy decisions).

I do not find that the duress, if any, in the present case was continuous and thus a bar to ratification of the contracts. As in *Weisert v. Bramman, supra*, 216 S.W.2d at 435, any duress ended some time before a claim of duress was raised, in the present case, not less than four years after the execution of the last contract. Construction of the highways has continued, evidently unaltered by the protracted litigation between the commission and the City. At the very least, these facts raise the possibility of ratification which would bar the City's defense and claim of duress.

22. *E. g., Brink v. Kansas City*, 355 Mo. 860, 198 S.W.2d 710 (1946) (property owners in sewer district recovered amounts paid on tax bills subsequently cancelled on ground that bills were contaminated by fraud; payments made under duress); *Westlake v. City of St. Louis*, 77 Mo. 47 (1882); *American Brewing Co. v. City of St. Louis*, 187 Mo. 367, 86 S.W. 129 (1905); *cf. Cocanig v. City of Chicago*, 21 Ill.2d 464, 173 N.E.2d 482 (1961) (suggestion that in some circumstances a suit for recovery of payments may be impractical and instead the utility should be enjoined); *see also Rockford Savings & Loan Ass'n v. City of Rockford*, 352 Ill. 348, 185 N.E. 623 (1933); *Manhattan Mill Co. v. Manhattan Gas & Elec. Co.*, 115 Kan. 712, 225

consciability[23], further illustrate the unique fact situation presented in this case, one in which is presented neither the dramatic unfairness so characteristic of duress and unconscionability cases nor the kind of commercial abuse found in economic duress cases.

Finally, I believe that expansion of the doctrine of duress into the area of intergovernmental relations would be extremely disruptive. Intergovernmental relations should ideally be harmonious; however, such relationships are not infrequently strained, especially where one governmental unit is given a greater position than another in the hierarchy of state political subdivisions. The existence of intergovernmental agreements, such as the contracts in the present case, represent one way this type of conflict may be resolved.[24] The use of the doctrine of duress as a defense in a case involving an intergovernmental agreement deflects the analysis away from the authority and powers of the respective governmental units, in this case a state agency and a charter municipality, and distorts the analysis as a consequence. I do not propose to exclude automatically duress as a defense from all cases in which intergovernmental agreements are at issue, but I do caution against embracing this defense without a more comprehensive analysis, especially in the absence of any allegation of bad faith.

In summary, I would hold that the Commission acted within its authority in establishing the policy requiring local municipalities to pay for acquisition of rights-of-way and in applying this policy to the City in the context of federal-aid highway construction. In my view, the controversy is one

P. 86 (1924); *Texas Power & Light Co. v. Doering Hotel Co.*, 147 S.W.2d 897 (Tex.Civ.App. 1941), *aff'd*, 139 Tex. 351, 162 S.W.2d 938 (1942). For example, in *American Brewing Co. v. City of St. Louis*, the brewery, a very large water user, sued the City to recover that part of its water bills attributable to excessive rates. The court used a duress analysis and characterized payments made under duress or compulsion and therefore recoverable as "payments of illegal charges or exactions under apprehension on the part of the payors of being stopped in their business if the money is not paid." 86 S.W. at 131–32. The court found that the brewery had paid the extra charges on its water bills in order to continue in business; therefore, the brewery was entitled to recover the excessive payments. *Id.* at 133.

Under a duress-by-public-utility analysis, the utility in question must have received or exacted payment to which it has no legal right. *E. g., American Brewing Co. v. City of St. Louis*, *supra*, 86 S.W. at 130 (excessive water rates); *see generally* 25 Am.Jur.2d Duress and Undue Influence § 8 (1966). In the present case, the Commission, in my opinion, did not impose an illegal charge or exact excessive payment. Furthermore, this analysis presupposes establishment of the Commission as a public utility.

**23.** The doctrine of unconscionability shares with duress and duress by a public utility, *see* note 14 *supra*, a concern over abuses of superior bargaining power in a commercial context. Unconscionability, unlike duress, focuses upon the contract itself rather than the process of contract formation. The doctrine of unconscionability provides relief from contracts which are grossly unfair or commercially unreasonable. *See* § 400.2–302 RSMo 1969 (1963

Mo.Laws 522, effective July 1, 1965); *see generally* J. White & R. Summers, Handbook of the Law under the Uniform Commercial Code, ch. 4 (1972); Note, 53 Iowa L.Rev. at 912 & n. 105; Comment, Bargaining Power and Unconscionability: A Suggested Approach to UCC § 2–302, 114 U.Pa.L.Rev. 998 (1966). Unconscionability may be procedural, that is concerning abuses in the bargaining process itself, or substantive, that is concerning the actual terms of a particular contract. Leff, Unconscionability and the Code—The Emperor's New Clause, 115 U.Pa.L. Rev. 485 (1967) (procedural-substantive analysis). "The principle is one of the prevention of oppression and unfair surprise and not of disturbance of allocation of risks because of superior bargaining power." U.C.C. § 2–302, Comment 1 (§ 400.2–302, Comment 1 RSMo 1969). Contracts found to be unconscionable, however, frequently involve consumers as the oppressed parties and adhesion or standard form contracts. *E. g., Williams v. Walker-Thomas Furniture Co.*, 121 U.S.App.D.C. 315, 350 F.2d 445 (1965).

Although the drafting of the contracts by one party and the lack of negotiation are characteristic of adhesion contracts, the City cannot be aptly described as having the same kind of inferior bargaining position as the average consumer or as surprised by the use of fine print, ambiguous language or misleading representations on the part of the Commission. Nor are the terms of the contracts excessively high in price or unfairly restrictive as to remedies. *See generally* White & Summers, *supra*, at 117–18.

**24.** § 70.220 RSMo 1969.

between two governmental units, the Commission and the City. In the absence of any authority to the contrary, I read our constitution, statutes and case law to give sufficient discretion to the Commission to establish the policy. I also disagree with the majority opinion's duress analysis as discussed above. I concur, however, with the majority in their decision to remand Count IV of the Commission's petition and the City's ultra vires defense. I join in the majority opinion's criticism of *Webb City & County Waterworks Co. v. City of Caterville*, 142 Mo. 101, 43 S.W. 625 (1897). The standard used in *Webb City* for determining whether a municipal obligation is valid, *id.* 43 S.W. at 629, is too restrictive in view of the many essential services now provided by modern municipalities.

